**City of Murphysboro, Illinois, Plaintiff-Appellant, v. Sanitary Water Board of State of Illinois, Defendant-Appellee.**

### Term No. 56–F–15.

Fourth District.

May 1, 1956.

Released for publication June 4, 1956.

David A. Warford, of Marion, and C. Edgar White, of Murphysboro, for plaintiff-appellant.

Latham Castle, Attorney General of State of Illinois, of Springfield, for defendant-appellee; John L. Davidson, Jr., First Assistant Attorney General, and Lucien S. Field, Assistant Attorney General, both of Springfield, of counsel.

JUSTICE SCHEINEMAN delivered the opinion of the court.

The City of Murphysboro filed a suit under the Administrative Review Act, attacking an order of the Sanitary Water Board of the State of Illinois, which directed the City to cease discharging its untreated sewage into the Big Muddy River. From a judgment sustaining the Board, the City appeals on the ground the findings and orders of the Board are against the manifest weight of the evidence.

This City has a population of about 9000 and discharges its untreated sewage into the river through four outlets. In 1948 the discharge averaged about 550,000 gallons per day. The City also obtains its water supply from the same river at a point upstream from the outlets, but the river sometimes backs up or reverses, under certain conditions, so that the waters from below the outlets get into the intake system. This happened in 1944, 1947 and 1953. Under the treatment used, the water continued to test as fit for drinking purposes.

City officials and other residents of the locality testified that there had been no complaint about pollution, no reports of adverse effects on fish, no reports of anyone being made ill by use of the water or by eating fish therefrom, and the tests each month had shown the water fit for drinking purposes. There is no other municipality between Murphysboro and the river's outlet into the Mississippi.

Sanitary engineers for the State reported upon conditions below the outlets as compared with the stream above the City. Besides the 1948 survey, tests were made at various points in 1952, 1953 and 1954. The witnesses found a diminution of oxygen content below the outlets, rising sludge, sludge banks, and gas bubbling,

112

and at times an odor. There was found a clear demarcation between the gray color of the flowing sewage and the green color of the algae in the water. Floating solids and scum were visible.

A state biologist took samples of water from nine different points, which showed the normal moderate bacteria above the outlets, but rapid displacement below them, with a substitution of varieties of bacteria which are tolerant of pollution. The displacement showed a substantial increase in later tests, until it became 100%. On these last tests the only organisms present were sludge worms, or oligochaeta or tubifex. These live on organic matter and are capable of getting oxygen under deplorable conditions. Another biologist testified these conditions are detrimental to fish life.

Other engineering testimony was that there must be a stream flow of 8 or 10 cubic feet of water per second for each 1000 persons discharging untreated sewage into the stream, to prevent nuisance conditions. Using statistics on the varying stream flow, and estimating 7000 persons discharging sewage, this engineer calculated that 32% of the time the flow is less than necessary to prevent nuisance conditions.

The Sanitary Water Board Act, Ch. 19, Ill. Rev. St., Sec. 145.10 prohibits disposal by any person of organic or inorganic matter into the waters of this State which shall cause pollution. Sec. 145.2(j) includes municipalities in the definition of persons. Sec. 145.6 authorizes the Board to determine if pollution exists and Sec. 145.9 gives the board power to order discontinuance of pollution. Sec. 145.2 defines pollution as follows:

"(a) 'Pollution' means such alteration of the physical, chemical or biological properties of any waters of this State, or such discharge of any liquid, gaseous or solid substance into any waters of the State as will or is likely to create a nuisance or render such waters

113

harmful or detrimental or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate uses, or to livestock, wild animals, birds, fish or other aquatic life."

The validity of this statute is not questioned. It is obviously intended primarily to protect public health, but is not limited to that purpose. And to constitute pollution, the definition does not require that all the conditions enumerated shall exist, they are stated in the disjunctive.

The argument for the City is predicated largely on the theory that the Board has no power to act except to abate a common-law nuisance, or at least upon a showing that fish were affected, or human illness already resulting. Cases cited include City of Chicago v. Reuter Bros. Iron Works, Inc., 398 Ill. 202; Rosehill Cemetery Co. v. City of Chicago, 352 Ill. 11; Hall v. Putney, 291 Ill. App. 508; and Lazarus & Cohen v. Parmly, 113 Ill. App. 624. Some of these are injunction cases, and all involve the question of what constitutes a nuisance at common law. None of them is in point under this statute.

On the other hand, there is the case of Village of Dwight v. Hayes, 150 Ill. 273, in which the court regarded the discharge of sewage from 1600 population into a small stream as a material pollution and nuisance per se.

In the present case the City has a population of 9000. Doubtless the river is large enough to provide adequate flow for disposal of the large volume of sewage most of the time. But the evidence is undisputed that, at times, the flow diminishes to the vanishing point and even backs up into the municipal water supply.

■ However, we do not interpret this statute to restrict the power of the Board to abatement of a com-

114

mon-law nuisance, which could be enjoined on complaint of individuals. That construction would render the statute nugatory and the Board needless. The Board is not restricted to "locking the barn door after the horse is stolen," but has powers aimed at prevention as well.

This Board is authorized to order pollution stopped. One definition of pollution is the "alteration of the physical, chemical or biological properties of the water," a condition conclusively proved. Another definition is the discharge of liquids or solid substances "likely to create a nuisance" or even likely to render the water "harmful or detrimental or injurious" to almost anything in which the public may be affected. There was substantial evidence that such pollution exists.

The findings of the Board were based on competent evidence, and we find no basis to declare the order contrary to the weight of the evidence. The judgment of the Circuit Court is affirmed.

Judgment affirmed.

BARDENS, P. J. and CULBERTSON, J., concur.