# CITY OF MILWAUKEE ET AL. *v.* ILLINOIS ET AL.

No. 79–408.   Argued December 2, 1980—Decided April 28, 1981

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, and POWELL, JJ., joined. BLACK-MUN, J., filed a dissenting opinion, in which MARSHALL and STEVENS, JJ., joined, *post*, p. 332.

*Elwin J. Zarwell* argued the cause for petitioners. With him on the briefs were *Richard W. Cutler, Samuel J. Recht, James H..Baxter III, Andrew M. Barnes, James B. Brennan,* and *Michael J. McCabe.*

*Joseph V. Karaganis,* Special Assistant Attorney General of

Illinois, argued the cause for respondents. With him on the brief for respondent State of Illinois were *Tyrone C. Fahner,* Attorney General, *Sanford R. Gail,* Special Assistant Attorney General, and *Russell R. Eggert.* On the brief for respondent State of Michigan were *Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Stewart H. Freeman* and *Thomas J. Emery,* Assistant Attorneys General.

*Andrew J. Levander* argued the cause *pro hac vice* for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General McCree, Assistant Attorney General Moorman, Deputy Solicitor General Claiborne, Dirk D. Snel, Martin W. Matzen,* and *Michele B. Corash.**

JUSTICE REHNQUIST delivered the opinion of the Court.

When this litigation was first before us we recognized the existence of a federal "common law" which could give rise to a claim for abatement of a nuisance caused by interstate water pollution. *Illinois* v. *Milwaukee,* 406 U. S. 91 (1972). Subsequent to our decision, Congress enacted the Federal Water Pollution Control Act Amendments of 1972. We granted cer-

---

*Briefs of *amici curiae* urging reversal were filed by *Bronson C. La Follette,* Attorney General, *David J. Hanson,* Deputy Attorney General, and *Nancy L. Arnold* and *Linda H. Bochert,* Assistant Attorneys General, for the State of Wisconsin; by *George W. Crockett, Jr.,* for the City of Detroit; and by *John M. Cannon* for Mid-America Legal Foundation.

Briefs of *amici curiae* urging affirmance were filed by *Robert Abrams,* Attorney General, *Shirley Siegel,* Solicitor General, and *Cyril H. Moore, Jr.,* and *Mary L. Lyndon,* Assistant Attorneys General, for the State of New York; and by *William W. Becker* for the New England Legal Foundation.

Briefs of *amici curiae* were filed by *Richard J. Kissel* and *Jeffrey C. Fort* for the Illinois State Chamber of Commerce; by *Robert A. Hillstrom* for the Metropolitan Waste Control Commission; and by *Ross D. Davis, John J. Gunther,* and *Stephen C. Chapple* for the National League of Cities et al.

tiorari to consider the effect of this legislation on the previously recognized cause of action. 445 U. S. 926.

I

Petitioners, the city of Milwaukee, the Sewerage Commission of the city of Milwaukee, and the Metropolitan Sewerage Commission of the County of Milwaukee, are municipal corporations organized under the laws of Wisconsin. Together they construct, operate, and maintain sewer facilities serving Milwaukee County, an area of some 420 square miles with a population of over one million people.[1] The facilities consist of a series of sewer systems and two sewage treatment plants located on the shores of Lake Michigan 25 and 39 miles from the Illinois border, respectively. The sewer systems are of both the "separated" and "combined" variety. A separated sewer system carries only sewage for treatment; a combined sewer system gathers both sewage and storm water runoff and transports them in the same conduits for treatment. On occasion, particularly after a spell of wet weather, overflows occur in the system which result in the discharge of sewage

---

[1] It is the statutory responsibility of the city Commission to "project, plan, construct, maintain and establish a sewerage system for the collection, transmission, and disposal of all sewage and drainage of the city." Wis. Stat. Ann. § 62.61 (1) (West Supp. 1980–1981). The city Commission is specifically given the authority to "plan, construct, and establish all local, district, lateral, intercepting, outfall or other sewers, and all conduits, drains and pumping or other plants, and all buildings, structures, works, apparatus, or agencies, and to lay all mains and pipes, and to create or use all such instrumentalities and means . . . as it deems expedient or necessary for carrying the sewerage system . . . into full effect." § 62.61 (1) (d). The county Commission is responsible for the construction of sewers within the metropolitan area but outside city limits. § 59.96 (6) (a). The city operates some sewers within the city, although the powers of the city Commission include the use and alteration, in its discretion, of "any or all existing public sewers or drains, including storm-water sewers and drains, in the city." § 62.61 (1) (e). Any construction by the city of local or sanitary sewers is subject to the prior written approval of the city Commission. § 62.67.

directly into Lake Michigan or tributaries leading into Lake Michigan.[2] The overflows occur at discrete discharge points throughout the system.

Respondent Illinois complains that these discharges, as well as the inadequate treatment of sewage at the two treatment plants, constitute a threat to the health of its citizens. Pathogens, disease-causing viruses and bacteria, are allegedly discharged into the lake with the overflows and inadequately treated sewage and then transported by lake currents to Illinois waters. Illinois also alleges that nutrients in the sewage accelerate the eutrophication, or aging, of the lake.[3] Respondent Michigan intervened on this issue only.

Illinois' claim was first brought to this Court when Illinois sought leave to file a complaint under our original jurisdiction. *Illinois* v. *Milwaukee, supra.* We declined to exercise original jurisdiction because the dispute was not between two States, and Illinois had available an action in federal district court. The Court reasoned that federal law applied to the dispute, one between a sovereign State and political subdivisions of another State concerning pollution of interstate waters, but that the various laws which Congress had enacted "touching interstate waters" were "not necessarily the only federal remedies available." *Id.,* at 101, 103. Illinois could appeal to federal common law to abate a public nuisance in

---

[2] Combined sewers are obviously more susceptible to overflows after storms because the storm water is transported in the same conduits as the sewage. Since ground water and water from storm sewers occasionally enter separated sewers, overflows in those systems are also more likely during wet weather. When the system is about to exceed its inherent capacity at given points, overflow devices, either mechanical or gravity, are activated, resulting in the discharge of the effluent. See 599 F. 2d 151, 167–168.

[3] Eutrophication is the natural process by which the nutrient concentration in a body of water gradually increases. The process is allegedly accelerated when nutrients in sewage, particularly phosphorus, are discharged into the water. See *id.,* at 169, n. 39.

interstate or navigable waters. The Court recognized, however, that:

"It may happen that new federal laws and new federal regulations may in time pre-empt the field of federal common law of nuisance. But until that time comes to pass, federal courts will be empowered to appraise the equities of the suits alleging creation of a public nuisance by water pollution." *Id.*, at 107.

On May 19, 1972, Illinois filed a complaint in the United States District Court for the Northern District of Illinois, seeking abatement, under federal common law, of the pubblic nuisance petitioners were allegedly creating by their discharges.[4]

Five months later Congress, recognizing that "the Federal water pollution control program . . . has been inadequate in every vital aspect," S. Rep. No. 92–414, p. 7 (1971), 2 Legislative History of the Water Pollution Control Act Amendments of 1972 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress), Ser. No. 93–1, p. 1425 (1973) (hereinafter Leg. Hist.), passed the Federal Water Pollution Control Act Amendments of 1972, Pub. L. 92–500, 86 Stat. 816. The Amendments established a new system of regulation under which it is illegal for anyone to discharge pollutants into the Nation's waters except pur-

---

[4] The complaint also sought relief, in counts II and III, under Illinois statutory and common law. See App. 29–32. The District Court stated that "the case should be decided under the principles of the federal common law of nuisance," App. to Pet. for Cert. F-2, but went on to find liability on all three counts of the complaint, *id.*, at F-24. The Court of Appeals ruled that "it is federal common law and not state statutory or common law that controls in this case, *Illinois* v. *Milwaukee, supra,* 406 U. S., at 107, & n. 9, . . . and therefore we do not address the state law claims." 599 F. 2d, at 177, n. 53. Although respondent Illinois argues this point in its brief, the issue before us is simply whether federal legislation has supplanted federal common law. The question whether state law is also available is the subject of Illinois' petition for certiorari, No. 79–571.

suant to a permit. §§ 301, 402 of the Act, 33 U. S. C. §§ 1311, 1342 (1976 ed. and Supp. III). To the extent that the Environmental Protection Agency, charged with administering the Act, has promulgated regulations establishing specific effluent limitations, those limitations are incorporated as conditions of the permit. See generally *EPA* v. *State Water Resources Control Board,* 426 U. S. 200 (1976). Permits are issued either by the EPA or a qualifying state agency. Petitioners operated their sewer systems and discharged effluent under permits issued by the Wisconsin Department of Natural Resources (DNR), which had duly qualified under § 402 (b) of the Act, 33 U. S. C. § 1342 (b) (1976 ed. and Supp. III), as a permit-granting agency under the superintendence of the EPA. See *EPA* v. *State Water Resources Control Board, supra,* at 208. Petitioners did not fully comply with the requirements of the permits and, as contemplated by the Act, § 402 (b)(7), 33 U. S. C. § 1342 (b)(7), see Wis. Stat. Ann. § 147.29 (West 1974), the state agency brought an enforcement action in state court. On May 25, 1977, the state court entered a judgment requiring discharges from the treatment plants to meet the effluent limitations set forth in the permits and establishing a detailed timetable for the completion of planning and additional construction to control sewage overflows.

Trial on Illinois' claim commenced on January 11, 1977. On July 29 the District Court rendered a decision finding that respondents had proved the existence of a nuisance under federal common law, both in the discharge of inadequately treated sewage from petitioners' plants and in the discharge of untreated sewage from sewer overflows. The court ordered petitioners to eliminate all overflows and to achieve specified effluent limitations on treated sewage. App. to Pet. for Cert. F–25—F–26. A judgment order entered on November 15 specified a construction timetable for the completion of detention facilities to eliminate overflows. Separated sewer overflows are to be completely eliminated by 1986; combined

sewer overflows by 1989. The detention facilities to be constructed must be large enough to permit full treatment of water from any storm up to the largest storm on record for the Milwaukee area. *Id.*, at D–1. Both the aspects of the decision concerning overflows and concerning effluent limitations, with the exception of the effluent limitation for phosphorus, went considerably beyond the terms of petitioners' previously issued permits and the enforcement order of the state court.

On appeal, the Court of Appeals for the Seventh Circuit affirmed in part and reversed in part. 599 F. 2d 151. The court ruled that the 1972 Amendments had not pre-empted the federal common law of nuisance, but that "[i]n applying the federal common law of nuisance in a water pollution case, a court should not ignore the Act but should look to its policies and principles for guidance." *Id.*, at 164. The court reversed the District Court insofar as the effluent limitations it imposed on treated sewage were more stringent than those in the permits and applicable EPA regulations. The order to eliminate all overflows, however, and the construction schedule designed to achieve this goal, were upheld.[5]

## II

Federal courts, unlike state courts, are not general common-law courts and do not possess a general power to develop and apply their own rules of decision. *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 78 (1938); *United States* v. *Hudson & Goodwin*, 7 Cranch 32 (1812). The enactment of a federal rule in an

---

[5] The Court of Appeals also rejected petitioners' contentions that there was no *in personam* jurisdiction under the Illinois long-arm statute, that any exercise of *in personam* jurisdiction failed to meet the minimum-contacts test of *International Shoe Co.* v. *Washington*, 326 U. S. 310 (1945), and that venue was improper. 599 F. 2d, at 155–157. We agree that, given the existence of a federal common-law claim at the commencement of the suit, prior to the enactment of the 1972 Amendments, personal jurisdiction was properly exercised and venue was also proper.

area of national concern, and the decision whether to displace state law in doing so, is generally made not by the federal judiciary, purposefully insulated from democratic pressures, but by the people through their elected representatives in Congress. *Wallis* v. *Pan American Petroleum Corp.*, 384 U. S. 63, 68 (1966).[6] *Erie* recognized as much in ruling that a federal court could not generally apply a federal rule of decision, despite the existence of jurisdiction, in the absence of an applicable Act of Congress.

When Congress has not spoken to a particular issue, however, and when there exists a "significant conflict between some federal policy or interest and the use of state law," *Wallis, supra,* at 68,[7] the Court has found it necessary, in a "few and restricted" instances, *Wheeldin* v. *Wheeler,* 373 U. S. 647, 651 (1963), to develop federal common law. See, *e. g., Clearfield Trust Co.* v. *United States,* 318 U. S. 363, 367 (1943). Nothing in this process suggests that courts are better suited to develop national policy in areas governed by federal common law than they are in other areas, or that the usual and important concerns of an appropriate division of functions between the Congress and the federal judiciary are inapplicable. See *TVA* v. *Hill,* 437 U. S. 153, 194 (1978); *Diamond* v. *Chakrabarty,* 447 U. S. 303, 317 (1980); *United States* v. *Gilman,* 347 U. S. 507, 511–513 (1954). We have always recognized that federal common law is "subject to the paramount authority of Congress." *New Jersey* v. *New*

---

[6] See Hart, The Relations Between State and Federal Law, 54 Colum. L. Rev. 489, 497 (1954) ("[f]ederal intervention has been thought of as requiring special justification, and the decision that such justification has been shown, being essentially discretionary, has belonged in most cases to Congress") (footnote omitted).

[7] In this regard we note the inconsistency in Illinois' argument and the decision of the District Court that both federal and state nuisance law apply to this case. If state law can be applied, there is no need for federal common law; if federal common law exists, it is because state law cannot be used.

*York,* 283 U. S. 336, 348 (1931). It is resorted to "[i]n absence of an applicable Act of Congress," *Clearfield Trust, supra,* at 367, and because the Court is compelled to consider federal questions "which cannot be answered from federal statutes alone," *D'Oench, Duhme & Co. v. FDIC,* 315 U. S. 447, 469 (1942) (Jackson, J., concurring). See also *Board of Commissioners v. United States,* 308 U. S. 343, 349 (1939); *United States v. Little Lake Misere Land Co.,* 412 U. S. 580, 594 (1973); *Miree v. DeKalb County,* 433 U. S. 25, 35 (1977) (BURGER, C. J., concurring in judgment). Federal common law is a "necessary expedient," *Committee for Consideration of Jones Falls Sewage System v. Train,* 539 F. 2d 1006, 1008 (CA4 1976) (en banc), and when Congress addresses a question previously governed by a decision, rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears. This was pointedly recognized in *Illinois v. Milwaukee* itself, 406 U. S., at 107 ("new federal laws and new federal regulations may in time pre-empt the field of federal common law of nuisance"), and in the lower court decision extensively relied upon in that case, *Texas v. Pankey,* 441 F. 2d 236, 241 (CA10 1971) (federal common law applies "[u]ntil the field has been made the subject of comprehensive legislation or authorized administrative standards") (quoted in *Illinois v. Milwaukee, supra,* at 107, n. 9).

In *Arizona v. California,* 373 U. S. 546 (1963), for example, the Court declined to apply the federal common-law doctrine of equitable apportionment it had developed in dealing with interstate water disputes because Congress, in the view of a majority, had addressed the question:

> "It is true that the Court has used the doctrine of equitable apportionment to decide river controversies between States. But in those cases Congress had not made any statutory apportionment. In this case, we have decided that Congress has provided its own method for allocat-

ing among the Lower Basin States the mainstream water to which they are entitled under the Compact. Where Congress has so exercised its constitutional power over waters, courts have no power to substitute their own notions of an 'equitable apportionment' for the apportionment chosen by Congress." *Id.*, at 565–566.

In *Mobil Oil Corp.* v. *Higginbotham,* 436 U. S. 618 (1978), the Court refused to provide damages for "loss of society" under the general maritime law when Congress had not provided such damages in the Death on the High Seas Act:

"We realize that, because Congress has never enacted a comprehensive maritime code, admiralty courts have often been called upon to supplement maritime statutes. The Death on the High Seas Act, however, announces Congress' considered judgment on such issues as the beneficiaries, the limitations period, contributory negligence, survival, and damages. . . . The Act does not address every issue of wrongful-death law, . . . but when it does speak directly to a question, the courts are not free to 'supplement' Congress' answer so thoroughly that the Act becomes meaningless." *Id.*, at 625.

Thus the question was whether the legislative scheme "spoke directly to a question"—in that case the question of damages—not whether Congress had affirmatively proscribed the use of federal common law. Our "commitment to the separation of powers is too fundamental" to continue to rely on federal common law "by judicially decreeing what accords with 'common sense and the public weal'" when Congress has addressed the problem. *TVA* v. *Hill, supra,* at 195.[8]

---

[8] The dissent errs in labeling our approach "automatic displacement," *post,* at 334. As evident *infra,* at 317–323, the question whether a previously available federal common-law action has been displaced by federal statutory law involves an assessment of the scope of the legislation and whether the scheme established by Congress addresses the problem formerly governed by federal common law. Our "detailed review of

Contrary to the suggestions of respondents, the appropriate analysis in determining if federal statutory law governs a question previously the subject of federal common law is not the same as that employed in deciding if federal law pre-empts state law. In considering the latter question " 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Jones* v. *Rath Packing Co.*, 430 U. S. 519, 525 (1977) (quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947)). While we have not hesitated to find pre-emption of state law, whether express or implied, when Congress has so indicated, see *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151, 157 (1978), or when enforcement of state regulations would impair "federal superintendence of the field," *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142 (1963), our analysis has included "due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy." *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 243 (1959). Such concerns are not implicated in the same fashion when the question is whether federal stat-

---

respondents' claims," *post,* at 348, is such an assessment and not, as the dissent suggests, a consideration of whether the particular common law applied below was reasonable.

The dissent's reference to "the unique role federal common law plays in resolving disputes between one State and the citizens or government of another," *post,* at 334, does not advance its argument. Whether interstate in nature or not, if a dispute implicates "Commerce . . . among the several States" Congress is authorized to enact the substantive federal law governing the dispute. Although the Court has formulated "interstate common law," *Kansas* v. *Colorado,* 206 U. S. 46, 98 (1907), it has done so not because the usual separation-of-powers principles do not apply, but rather because interstate disputes frequently call for the application of a federal rule when Congress has not spoken. When Congress has spoken its decision controls, even in the context of interstate disputes. See *Arizona* v. *California,* 373 U. S. 546 (1963).

utory or federal common law governs, and accordingly the same sort of evidence of a clear and manifest purpose is not required. Indeed, as noted, in cases such as the present "we start with the assumption" that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law.[9]

## III

We conclude that, at least so far as concerns the claims of respondents, Congress has not left the formulation of appropriate federal standards to the courts through application of often vague and indeterminate nuisance concepts and maxims of equity jurisprudence, but rather has occupied the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency. The 1972 Amendments to the Federal Water Pollution Control Act were not merely another law "touching interstate waters" of the sort surveyed in *Illinois* v. *Milwaukee*, 406 U. S., at 101–103, and found inadequate to supplant federal common law. Rather, the Amendments were viewed by Congress as a "total restructuring" and "complete rewriting" of the existing water pollution legislation considered in that case. 1 Leg. Hist. 350–351 (remarks of Chairman Blatnik of the House Committee which drafted the House version of the Amendments); *id.*, at 359–360 (remarks of Rep. Jones). See S. Rep. No. 92–414, p. 95 (1971), 2 Leg. Hist. 1511; *id.*, at 1271 (remarks of Chairman Randolph of the Senate Committee which drafted the Senate version of the Amendments); see also *EPA*

---

[9] Since the States are represented in Congress but not in the federal courts, the very concerns about displacing state law which counsel against finding pre-emption of *state* law in the absence of clear intent actually suggest a willingness to find congressional displacement of *federal* common law. Simply because the opinion in *Illinois* v. *Milwaukee* used the term "pre-emption," usually employed in determining if federal law ·displaces state law, is no reason to assume the analysis used to decide the usual federal-state questions is appropriate here.

v. *State Water Resources Control Board,* 426 U. S., at 202–203.[10]
Congress' intent in enacting the Amendments was clearly to
establish an all-encompassing program of water pollution reg-
ulation. *Every* point source discharge [11] is prohibited unless
covered by a permit, which directly subjects the discharger
to the administrative apparatus established by Congress to
achieve its goals. The "major purpose" of the Amendments
was "to establish a *comprehensive* long-range policy for the
elimination of water pollution." S. Rep. No. 92–414, at 95, 2
Leg. Hist. 1511 (emphasis supplied). No Congressman's re-
marks on the legislation were complete without reference to the
"comprehensive" nature of the Amendments. A House spon-
sor described the bill as "the most comprehensive and far-
reaching water pollution bill we have ever drafted," 1 Leg.
Hist. 369 (Rep. Mizell), and Senator Randolph, Chairman of
the responsible Committee in the Senate, stated: "It is perhaps
the most comprehensive legislation ever developed in its field.
It is perhaps the most comprehensive legislation that the Con-
gress of the United States has ever developed in this particular
field of the environment." 2 *id.,* at 1269.[12] This Court was

---

[10] The dissent considers the Water Pollution Control Act of 1948
"broad and systematic," *post,* at 338, and emphasizes that the Court in
*Illinois* v. *Milwaukee* did not view then-existing federal statutes as a
barrier to the recognition of federal common law, *post,* at 337. The sug-
gestion is that the present legislation similarly should be no barrier. This
ignores Congress' view that the previous legislation was "inadequate in
every vital aspect," 2 Leg. Hist. 1425, and Congress' clear intent, wit-
nessed by the statements and citations in the text, to do something
quite different with the 1972 Amendments.

[11] "Point source" is defined in § 502 (14) of the Act, 33 U. S. C. § 1362
(14) (1976 ed., Supp. III), as "any discernible, confined and discrete
conveyance . . . from which pollutants are or may be discharged." There
is no question that all of the discharges involved in this case are point
source discharges.

[12] The most casual perusal of the legislative history demonstrates that
these views on the comprehensive nature of the legislation were practically
universal. See, *e. g.,* 1 Leg. Hist. 343 (Rep. Young); *id.,* at 350 (Rep.
Blatnik); *id.,* at 374 (Rep. Clausen); *id.,* at 380 (Rep. Roberts); *id.,* at

obviously correct when it described the 1972 Amendments as establishing "a comprehensive program for controlling and abating water pollution." *Train* v. *City of New York,* 420 U. S. 35, 37 (1975).[13] The establishment of such a self-consciously comprehensive program by Congress, which certainly did not exist when *Illinois* v. *Milwaukee* was decided, strongly suggests that there is no room for courts to attempt to improve on that program with federal common law. See *Texas* v. *Pankey,* 441 F. 2d, at 241.[14]

Turning to the particular claims involved in this case, the action of Congress in supplanting the federal common law is perhaps clearest when the question of effluent limitations for discharges from the two treatment plants is considered. The duly issued permits under which the city Commission discharges treated sewage from the Jones Island and South Shore treatment plants incorporate, as required by the Act, see § 402 (b)(1), 33 U. S. C. § 1342 (b)(1) (1976 ed. and Supp.

---

425 (Rep. Roe); *id.,* at 450 (Rep. Reuss); *id.,* at 467 (Rep. Dingell); *id.,* at 481 (Rep. Caffery); 2 *id.,* at 1302 (Sen. Cooper); *id.,* at 1408 (Sen. Hart).

[13] The Court of Appeals itself recognized that Congress in the 1972 Amendments "established a comprehensive and detailed system for the regulation and eventual elimination of pollutant discharges into the nation's waters." 599 F. 2d, at 162.

[14] This conclusion is not undermined by Congress' decision to permit States to establish more stringent standards, see § 510, 33 U. S. C. § 1370. While Congress recognized a role for the States, the comprehensive nature of its action suggests that it was the exclusive source of *federal* law. Cases recognizing that the comprehensive character of a federal program is an insufficient basis to find pre-emption of state law are not in point, since we are considering which branch of the Federal Government is the source of federal law, not whether that law pre-empts state law, see *supra,* at 316–317. Since federal courts create federal common law only as a necessary expedient when problems requiring federal answers are not addressed by federal statutory law, see *supra,* at 312–315, the comprehensive character of a federal statute is quite relevant to the present question, while it would not be were the question whether state law, which of course does not depend upon the absence of an applicable Act of Congress, still applied.

III), the specific effluent limitations established by EPA regulations pursuant to § 301 of the Act, 33 U. S. C. § 1311 (1976 ed. and Supp. III). App. 371–394, 395–424; see 40 CFR § 133.102 (1980). There is thus no question that the problem of effluent limitations has been thoroughly addressed through the administrative scheme established by Congress, as contemplated by Congress. This being so there is no basis for a federal court to impose more stringent limitations than those imposed under the regulatory regime by reference to federal common law, as the District Court did in this case. The Court of Appeals, we believe, also erred in stating:

> "Neither the minimum effluent limitations prescribed by EPA pursuant to the provisions of the Act nor the effluent limitations imposed by the Wisconsin agency under the National Pollutant Discharge Elimination System limit a federal court's authority to require compliance with more stringent limitations under the federal common law." 599 F. 2d, at 173.

Federal courts lack authority to impose more stringent effluent limitations under federal common law than those imposed by the agency charged by Congress with administering this comprehensive scheme.

The overflows do not present a different case. They are point source discharges and, under the Act, are prohibited unless subject to a duly issued permit. As with the discharge of treated sewage, the overflows, through the permit procedure of the Act, are referred to expert administrative agencies for control. All three of the permits issued to petitioners explicitly address the problem of overflows. The Jones Island and South Shore permits, in addition to covering discharges from the treatment plants, also cover overflows from various lines leading to the plants. As issued on December 24, 1974, these permits require the city Commission "to initiate a program leading to the elimination or control of all discharge overflow and/or bypass points in the [Jones Island or South

Shore, respectively] Collector System . . . to assure attainment of all applicable Water Quality Standards." App. 378–379, 416. The specific discharge points are identified. The Commission was required to submit a detailed plan to DNR designed to achieve these objectives, including alternative engineering solutions and cost estimates, file a report on an attached form for all overflows that do occur, install monitoring devices on selected overflows discharge points, and file more detailed quarterly reports on the overflows from those points. The Commission was also required to complete "facilities planning" for the combined sewer area. "The facilities planning elements include a feasibility study, cost-effectiveness analysis and environmental assessment for elimination or control of the discharges from the combined sewers." Quarterly progress reports on this planning are required. *Id.,* at 379. A permit issued to the city on December 18, 1974, covers discharges "from sanitary sewer crossovers, combined sewer crossovers and combined sewer overflows." *Id.,* at 425. Again the discharge points are specifically identified. As to separated sewers, the city "is required to initiate a program leading to the elimination of the sanitary sewer crossovers (gravity) and the electrically operated relief pumps . . . ." *Id.,* at 438. A detailed plan to achieve this objective must be submitted, again with alternative engineering solutions and cost estimates, any overflows must be reported to DNR on a specified form, and monitoring devices are required to be installed on selected points to provide more detailed quarterly reports. As to the combined sewers, the city "is required to initiate a program leading to the attainment of control of overflows from the city's combined sewer system . . . ." *Id.,* at 443. The city is required to cooperate with and assist the city Commission in facilities planning for combined sewers, see *supra,* this page, submit quarterly progress reports to DNR, file reports on all discharges, and install monitoring devices on selected discharge points to provide more detailed quar-

terly reports "until the discharges are eliminated or controlled." App. 444.[15]

The enforcement action brought by the DNR in state court resulted in a judgment requiring "[e]limination of any bypassing or overflowing which occurs within the sewerage systems under dry weather by not later than July 1, 1982." *Id.*, at 465. Wet weather overflows from separated sewers were to be subject to a coordinated effort by the Commissions resulting in correction of the problem by July 1, 1986, pursuant to a plan submitted to the DNR. *Id.*, at 469–471. As to the combined sewer overflows, the Commissions were required to accomplish an abatement project, with design work completed by July 1, 1981, and construction by July 1, 1993. Annual progress reports were required to be submitted to the DNR. *Id.*, at 471–472.

It is quite clear from the foregoing that the state agency

---

[15] The regulatory approach of the DNR to overflows reflected in these permit conditions was not plucked out of thin air but rather followed the approach in EPA regulations, issued pursuant to the Act, governing the availability of federal funds for treatment works construction, including construction of facilities to control sewer overflows. The regulations provide, as do the permits, for detailed evaluation of feasibility, engineering alternatives, and costs prior to the commencement of a particular construction project. See 40 CFR §§ 35.903, 35.917 (1980). The "facilities planning" referred to in the permits for control of combined sewer overflows is a term of art defined in exhaustive detail in the EPA regulations, see §§ 35.917–35.917–9. Such facilities planning constitutes the first step in qualifying for federal financial assistance for construction projects. It was the statutorily articulated intent of Congress to make funds available, subject to certain conditions, for projects to control overflows, see §§ 201 (g)(1), 212 (2)(A), (B), 33 U. S. C. §§ 1281 (g)(1), 1292 (2)(A), (B) (1976 ed. and Supp. III); see also S. Rep. No. 92–414, pp. 40–41 (1971), 2 Leg. Hist. 1458–1459; 1 *id.*, at 165 (Sen. Muskie); 2 *id.*, at 1379 (Sen. Magnuson). We are not impressed with arguments that more in the way of immediate solutions should have been required of the dischargers when such requirements may have had the effect, under EPA regulations requiring exhaustive planning and examination of alternatives, of foreclosing recourse to funds Congress intended to be available.

duly authorized by the EPA to issue discharge permits under the Act has addressed the problem of overflows from petitioners' sewer system. The agency imposed the conditions it considered best suited to further the goals of the Act, and provided for detailed progress reports so that it could continually monitor the situation. Enforcement action considered appropriate by the state agency was brought, as contemplated by the Act, again specifically addressed to the overflow problem. There is no "interstice" here to be filled by federal common law: overflows are covered by the Act and have been addressed by the regulatory regime established by the Act. Although a federal court may disagree with the regulatory approach taken by the agency with responsibility for issuing permits under the Act, such disagreement alone is no basis for the creation of federal common law.[16]

Respondents strenuously argue that federal common law continues to be available, stressing that neither in the permits nor the enforcement order are there any effluent limitations on overflows. This argument, we think, is something of a red herring. The difference in treatment between overflows and treated effluent by the agencies is due to differences in the *nature* of the problems, *not* the extent to which the problems have been addressed.[17] The relevant question with overflow discharges is not, as with discharges of treated sewage, what concentration of various pollutants will be permitted. Rather the question is what degree of control will be required in

[16] In light of this conclusion we need not consider petitioners' argument that, assuming the availability of a cause of action, the lower courts erred in concluding that respondents' evidence sufficed to establish the existence of a nuisance.

[17] See EPA, Benefit Analysis for Combined Sewer Overflow Control 4 (1979) ("regulations governing combined sewer overflows require permits for each outfall . . . they differ from the . . . permits for treatment plants, which specify effluent limitations based on technology or water quality standards. NPDES permits for combined sewer overflows contain no effluent limitations, though they do usually require monitoring and data collection").

preventing overflows and ensuring that the sewage undergoes treatment. This question is answered by construction plans designed to accommodate a certain amount of sewage that would otherwise be discharged on overflow occasions. The EPA has not promulgated regulations mandating specific control guidelines because of a recognition that the problem is "site specific." See, *e. g.*, EPA Program Requirements Memorandum PRM No. 75–34 (Dec. 16, 1975):

> "The costs and benefits of control of various portions of pollution due to combined sewer overflows and by-passes vary greatly with the characteristics of the sewer and treatment system, the duration, intensity, frequency, and aerial extent of precipitation, the type and extent of development in the service area, and the characteristics, uses and water quality standards of the receiving waters. Decisions on grants for control of combined sewer overflows, therefore, must be made on a case-by-case basis after detailed planning at the local level."

See also EPA, Report to Congress on Control of Combined Sewer Overflow in the United States 7–1, 7–13 (MCD–50, 1978). Decision is made on a case-by-case basis, through the permit procedure, as was done here. Demanding specific regulations of general applicability before concluding that Congress has addressed the problem to the exclusion of federal common law asks the wrong question. The question is whether the field has been occupied, not whether it has been occupied in a particular manner.[18]

---

[18] The point is perhaps made most clear if one asks what inadequacy in the treatment by Congress the courts below rectified through creation of federal common law. In imposing stricter effluent limitations the District Court was not "filling a gap" in the regulatory scheme, it was simply providing a different regulatory scheme. The same is true with overflows. The District Court simply ordered planning and construction designed to achieve more stringent control of overflows than the planning and construction undertaken pursuant to the permits. The same point is evident in examining respondents' arguments. The basic complaint is that the

The invocation of federal common law by the District Court and the Court of Appeals in the face of congressional legislation supplanting it is peculiarly inappropriate in areas as complex as water pollution control. As the District Court noted:

"It is well known to all of us that the arcane subject matter of some of the expert testimony in this case was sometimes over the heads of all of us to one height or another. I would certainly be less than candid if I did not acknowledge that my grasp of some of the testimony was less complete than I would like it to be . . . ." App. to Pet. for Cert. F–4.

Not only are the technical problems difficult—doubtless the reason Congress vested authority to administer the Act in administrative agencies possessing the necessary expertise—but the general area is particularly unsuited to the approach inevitable under a regime of federal common law. Congress criticized past approaches to water pollution control as being "sporadic" and "ad hoc," S. Rep. No. 92–414, p. 95 (1971), 2 Leg. Hist. 1511, apt characterizations of any judicial approach applying federal common law, see *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U. S. 310, 319 (1955).

It is also significant that Congress addressed in the 1972 Amendments one of the major concerns underlying the recognition of federal common law in *Illinois* v. *Milwaukee*. We were concerned in that case that Illinois did not have any forum in which to protect its interests unless federal common law were created. See 406 U. S., at 104, 107. In the 1972

permits issued to petitioners under the Act do not control overflows or treated discharges in a sufficiently stringent manner, not that permits under the Act cannot deal with these subjects or that the instant permits do not do so. At most respondents argue not that the Act is inadequate, as was the legislation considered in *Illinois* v. *Milwaukee,* but that these *particular* permits issued under it are. This does not suffice to create an "interstice" to be filled by federal common law.

Amendments Congress provided ample opportunity for a State affected by decisions of a neighboring State's permit-granting agency to seek redress. Under § 402 (b)(3), 33 U. S. C. § 1342 (b)(3), a state permit-granting agency must ensure that any State whose waters may be affected by the issuance of a permit receives notice of the permit application and the opportunity to participate in a public hearing. Wisconsin law accordingly guarantees such notice and hearing, see Wis. Stat. Ann. §§ 147.11, 147.13 (West Supp. 1980–1981). Respondents received notice of each of the permits involved here, and public hearings were held, but they did not participate in them in any way. Section 402 (b)(5), 33 U. S. C. § 1342 (b)(5), provides that state permit-granting agencies must ensure that affected States have an opportunity to submit written recommendations concerning the permit applications to the issuing State and the EPA, and both the affected State and the EPA must receive notice and a statement of reasons if any part of the recommendations of the affected State are not accepted. Again respondents did not avail themselves of this statutory opportunity. Under § 402 (d)(2)(A), 33 U. S. C. § 1342 (d)(2)(A) (1976 ed., Supp. III), the EPA may veto any permit issued by a State when waters of another State may be affected. Respondents did not request such action. Under § 402 (d)(4) of the Act, 33 U. S. C. § 1342 (d)(4) (1976 ed., Supp. III), added in .1977, the EPA itself may issue permits if a stalemate between an issuing and objecting State develops. The basic grievance of respondents is that the permits issued to petitioners pursuant to the Act do not impose stringent enough controls on petitioners' discharges. The statutory scheme established by Congress provides a forum for the pursuit of such claims before expert agencies by means of the permit-granting process. It would be quite inconsistent with this scheme if federal courts were in effect to "write their own ticket" under the guise of federal common law after permits have already been issued and permittees have been planning and operating in reliance on them.

Respondents argue that congressional intent to preserve the federal common-law remedy recognized in *Illinois* v. *Milwaukee* is evident in §§ 510 and 505 (e) of the statute, 33 U. S. C. §§ 1370, 1365 (e).[19] Section 510 provides that nothing in the Act shall preclude States from adopting and enforcing limitations on the discharge of pollutants more stringent than those adopted under the Act.[20] It is one thing, how-

---

[19] It must be noted that the legislative activity resulting in the 1972 Amendments largely occurred prior to this Court's decision in *Illinois* v. *Milwaukee*. Drafting, filing of Committee Reports, and debate in both Houses took place prior to the decision. Only conference activity occurred after. It is therefore difficult to argue that particular provisions were designed to preserve a federal common-law remedy not yet recognized by this Court.

The dissent cites several cases for the proposition that the federal common-law nuisance remedy existed "[l]ong before" *Illinois* v. *Milwaukee*. *Post*, at 335. During the legislative activity resulting in the 1972 Amendments, however, this Court's decision in *Ohio* v. *Wyandotte Chemicals Corp.*, 401 U. S. 493 (1971), indicated that *state* common law would control a claim such as Illinois'. *Wyandotte*, like the present suit, was brought by a State to abate a pollution nuisance created by out-of-state defendants. The Court ruled that "an action such as this, if otherwise cognizable in federal district court, would have to be adjudicated under state law. *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938)." *Id.*, at 498–499, n. 3. The Court in *Illinois* v. *Milwaukee* found it necessary to overrule this statement, see 406 U. S., at 102, n. 3.

[20] In full, § 510, as set forth in 33 U. S. C. § 1370, provides:

"Except as expressly provided in this chapter, nothing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this chapter, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this chapter; or (2) be construed as impairing or in any manner affecting any

ever, to say that States may adopt more stringent limitations through state administrative processes, or even that States may establish such limitations through state nuisance law, and apply them to in-state dischargers. It is quite another to say that the States may call upon *federal* courts to employ *federal* common law to establish more stringent standards applicable to out-of-state dischargers. Any standards established under federal common law are federal standards, and so the authority of States to impose more stringent standards under § 510 would not seem relevant. Section 510 clearly contemplates state authority to establish more stringent pollution limitations; nothing in it, however, suggests that this was to be done by federal-court actions premised on federal common law.

Subsection 505 (e) provides:

> "Nothing *in this section* shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency)" (emphasis supplied).

Respondents argue that this evinces an intent to preserve the federal common law of nuisance. We, however, are inclined to view the quoted provision as meaning what it says: that nothing *in § 505,* the citizen-suit provision, should be read as limiting any other remedies which might exist.

Subsection 505 (e) is virtually identical to subsections in the citizen-suit provisions of several environmental statutes.[21]

---

right or jurisdiction of the States with respect to the waters (including boundary waters) of such States."

[21] See, *e. g.,* § 304 (e) of the Clean Air Act, 42 U. S. C. § 7604 (e) (1976 ed., Supp. III); § 16 (e) of the Deepwater Port Act of 1974, 33 U. S. C. § 1515 (e); § 105 (g)(5) of the Marine Protection, Research, and Sanctuaries Act of 1972, 33 U. S. C. § 1415 (g)(5); § 12 (e) of the Noise Control Act of 1972, 42 U. S. C. § 4911 (e); § 7002 (f) of the Solid Waste Disposal Act, 42 U. S. C. § 6972 (f); § 1449 (e) of the Safe Drinking Water Act, 42

The subsection is common language accompanying citizen-suit provisions and we think that it means only that the provision of such suit does not revoke other remedies. It most assuredly cannot be read to mean that the Act as a whole does not supplant formerly available federal common-law actions but only that the particular section authorizing citizen suits does not do so. No one, however, maintains that the citizen-suit provision pre-empts federal common law.

We are thus not persuaded that § 505 (e) aids respondents in this case, even indulging the unlikely assumption that the reference to "common law" in § 505 (e) includes the limited *federal* common law as opposed to the more routine state common law. See *Committee for Consideration of Jones Falls Sewage System* v. *Train,* 539 F. 2d, at 1009, n. 9.[22]

The dissent considers "particularly revealing," *post,* at 343, a colloquy involving Senators Griffin, Muskie, and Hart, concerning the pendency of an action by the EPA against Reserve Mining Co. Senator Griffin expressed concern that "one provision in the conference agreement might adversely

---

U. S. C. § 300j–8 (e) (1976 ed., Supp. III); § 520 (e) of the Surface Mining Control and Reclamation Act of 1977, 30 U. S. C. § 1270 (e) (1976 ed., Supp. III); and § 20 (c) (3) of the Toxic Substances Control Act, 15 U. S. C. § 2619 (c) (3).

[22] The dissent's criticism of our reading of § 505 (e), *post,* at 341–342, is misplaced. There is nothing unusual about Congress enacting a particular provision, and taking care that this enactment by itself not disturb other remedies, without considering whether the rest of the Act does so or what other remedies may be available. The fact that the language of § 505 (e) is repeated *in haec verba* in the citizen-suit provisions of a vast array of environmental legislation, see n. 21, *supra,* indicates that it does not reflect any considered judgment about what other remedies were previously available or continue to be available under any particular statute. The dissent refers to our reading as "extremely strained," but the dissent, in relying on § 505 (e) as evidence of Congress' intent to preserve the federal common-law nuisance remedy, must read "nothing in this section" to mean "nothing in this Act." We prefer to read the statute as written. Congress knows how to say "nothing in this Act" when it means to, see, *e. g.,* Pub. L. 96–510, § 114 (a), 94 Stat. 2795.

affect a number of pending lawsuits brought under the Refuse Act of 1899," including the Reserve Mining litigation. 1 Leg. Hist. 190. The provision which concerned Senator Griffin, enacted as § 402 (k), 86 Stat. 883, 33 U. S. C. § 1342 (k), provides, in pertinent part:

> "Until December 31, 1974, in any case where a permit for discharge has been applied for pursuant to this section, but final administrative disposition of such application has not been made, such discharge shall not be a violation of (1) section 301, 306, or 402 of this Act, or (2) section 13 of the Act of March 3, 1899, unless the Administrator or other plaintiff proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required or requested in order to process the application."

Senator Griffin was concerned about the relation between this provision and § 4 (a) of the bill, which provided that "[n]o suit, action or other proceeding lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under the Federal Water Pollution Control Act as in effect immediately prior to the date of enactment of the Act shall abate by reason of the taking effect of the amendment made by section 2 of this Act." Senator Griffin stated that "when these provisions are read together, it is not altogether clear what effect is intended with respect to pending Federal court suits against pollutors violating the Refuse Act of 1899."

Senator Muskie responded to Senator Griffin's concerns *by quoting* § 4 (a) and stating that "[w]ithout any question it was the intent of the conferees that this provision include enforcement actions brought under the Refuse Act, the Federal Water Pollution Control Act, and any other acts of Congress." 1 Leg. Hist. 193. Later Senator Hart stated: "It is

my understanding, . . . after the explanation of the Senator from Maine, that the suit now pending against the Reserve Mining Co., under the Refuse Act of 1899 will in no way be affected nor will any of the other counts under the existing Federal Water Pollution Control Act or other law." *Id.,* at 211.[23] When Senator Muskie's and Hart's remarks are viewed in this context it is clear that they do not bear on the issue now before the Court. In the first place, although there was a federal common-law claim in the Reserve Mining litigation, Senator Griffin focused on the Refuse Act of 1899—not federal common law. Senator Muskie, with his reference to "other acts of Congress," rather clearly was not discussing federal *common* law. Most importantly, however, Senator Muskie based his response to Senator Griffin—that the Reserve Mining suit would not be affected—on a specific section of the bill, § 4 (a), which is not applicable to suits other than those brought by or against the Federal Government and pending when the Amendments were enacted. Senator Hart based his response on the explanation given by Senator Muskie. Even if we assumed that the legislators were focusing on the federal common-law aspects of the Reserve Mining litigation (and we do not think they were), Senators Muskie and Hart informed Senator Griffin that the Reserve Mining suit was not affected *because of § 4 (a)*, and not at all because the Act did not displace the federal common law of nuisance. Senator Griffin's question focused on § 4 (a); understandably, so did the assurances he received. Nothing

[23] The dissent states that "Senators Muskie and Hart each responded" as Senator Hart is quoted in the text. *Post,* at 344. This is not strictly accurate. Senator Muskie never responded as Senator Hart did, but rather as quoted in the text above, with the clear reference to § 4 (a). He did not, like Senator Hart, use the phrase "other law" but rather, and of particular significance in the present context, the phrase *"any other acts of Congress."* This inaccuracy in the dissent appears to be of no little importance, since the dissent attaches great weight to the views of Senator Muskie, see *post,* at 344, n. 16.

about the colloquy suggests any intent concerning the continued validity of federal common law. The issue simply did not come up because Senator Griffin's concerns were fully answered by a particular section not applicable in the case before us.[24]

We therefore conclude that no federal common-law remedy was available to respondents in this case. The judgment of the Court of Appeals is therefore vacated, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL and JUSTICE STEVENS join, dissenting.

Nine years ago, in *Illinois* v. *Milwaukee,* 406 U. S. 91 (1972), this Court unanimously determined that Illinois could bring a federal common-law action against the city of

---

[24] In the similar colloquy in the House, also relied upon by the dissent, Representative Wright responded to a question from Representative Dingell in precisely the same manner as Senator Muskie responded to Senator Griffin, relying on § 4 (a), and referring to "other acts of Congress." 1 Leg. Hist. 248. Representative Dingell never mentioned federal common law in his question.

The dissent also relies on the failure of Congress to enact, in 1977, an amendment "proposed" by Representative Aspin. *Post,* at 345–346. This reliance ignores not only the fact that "unsuccessful attempts at legislation are not the best of guides to legislative intent," *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 381–382, n. 11 (1969), but also, even assuming the failure to enact the Aspin "proposal" is some indication of Congress' intent in 1977, the "oft-repeated warning" that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102, 117–118 (1980). These admonitions do not even come into play, however, since the Aspin proposal was never introduced in either House of Congress; it does not even appear in the Congressional Record. The fate of the Aspin "proposal" has under our precedents dealing with statutory interpretation nothing whatever to do with Congress' intent concerning federal common law when it enacted the 1972 Amendments.

Milwaukee, three other Wisconsin cities, and two sewerage commissions. At that time, Illinois alleged that the discharge of raw and untreated sewage by these Wisconsin entities into Lake Michigan created a public nuisance for the citizens of Illinois. The Court remitted the parties to an appropriate federal district court, "whose powers are adequate to resolve the issues." *Id.*, at 108.

Illinois promptly initiated the present litigation,[1] and pursued it through more than three years of pretrial discovery, a 6-month trial that entailed hundreds of exhibits and scores of witnesses, extensive factual findings by the District Court, App. F to Pet. for Cert., and an exhaustive review of the evidence by the Court of Appeals. 599 F. 2d 151, 167–177 (CA7 1979). Today, the Court decides that this 9-year judicial exercise has been just a meaningless charade, cf. *Hughes Tool Co.* v. *Trans World Airlines, Inc.*, 409 U. S. 363, 389, 390 (1973) (dissenting opinion), inasmuch as, it says, the federal common-law remedy approved in *Illinois* v. *Milwaukee* was implicitly extinguished by Congress just six months after the 1972 decision. Because I believe that Congress intended no such extinction, and surely did not contemplate the result reached by the Court today, I respectfully dissent.

## I

The Court's analysis of federal common-law displacement rests, I am convinced, on a faulty assumption. In contrasting congressional displacement of the common law with federal pre-emption of state law,[2] the Court assumes that as

---

[1] This Court's decision was issued April 24, 1972. The complaint was filed in the United States District Court for the Northern District of Illinois on May 19, 1972.

[2] I have no quarrel with the Court's distinction between the issues of federalism at stake in assessing congressional pre-emption of state law and the separation-of-powers concerns that are implicated here. But there is more to this distinction than the Court suggests. In deciding whether federal law pre-empts state law, the Court must be sensitive to the

soon as Congress "addresses a question previously governed" by federal common law, "the need for such an unusual exercise of lawmaking by federal courts disappears." *Ante,* at 314. This "automatic displacement" approach is inadequate in two respects. It fails to reflect the unique role federal common law plays in resolving disputes between one State and the citizens or government of another. In addition, it ignores this Court's frequent recognition that federal common law may complement congressional action in the fulfillment of federal policies.

It is well settled that a body of federal common law has survived the decision in *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938). *Erie* made clear that federal courts, as courts of limited jurisdiction, lack general power to formulate and impose their own rules of decision. *Id.,* at 78. The Court, however, did not there upset, nor has it since disturbed, a deeply rooted, more specialized federal common law that has arisen to effectuate federal interests embodied either in the Constitution or an Act of Congress.[3] Chief among the fed-

---

potential frustration of national purposes if the States are permitted to control conduct that is the subject of federal regulation. *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 244 (1959). See *Florida Lime & Avocado Growers, Inc.* v. *Paul,* 373 U. S. 132, 142 (1963). For this reason, in pre-emption analysis the role of federal law is often determined on an "all or nothing" basis. On the other hand, where federal interests alone are at stake, participation by the federal courts is often desirable, and indeed necessary, if federal policies developed by Congress are to be fully effectuated. See, *e. g., Miree* v. *DeKalb County,* 433 U. S. 25, 35 (1977) (opinion concurring in judgment); *United States* v. *Little Lake Misere Land Co.,* 412 U. S. 580, 592–593 (1973). The whole concept of interstitial federal lawmaking suggests a cooperative interaction between courts and Congress that is less attainable where federal-state questions are involved.

[3] See generally Hill, The Law-Making Power of the Federal Courts: Constitutional Preemption, 67 Colum. L. Rev. 1024, 1026–1042 (1967); Friendly, In Praise of *Erie*—and of the New Federal Common Law, 39 N. Y. U. L. Rev. 383, 405–422 (1964). See also Leybold, Federal Com-

eral interests served by this common law are the resolution of interstate disputes and the implementation of national statutory or regulatory policies.

Both before and after *Erie,* the Court has fashioned federal law where the interstate nature of a controversy renders inappropriate the law of either State. See, *e. g., Nebraska* v. *Wyoming,* 325 U. S. 589 (1945); *Hinderlider* v. *La Plata Co.,* 304 U. S. 92, 110 (1938); *Kansas* v. *Colorado,* 206 U. S. 46, 95, 97–98 (1907) (apportioning waters of interstate stream). See also *Cissna* v. *Tennessee,* 246 U. S. 289, 296 (1918); *Howard* v. *Ingersoll,* 13 How. 381 (1852) (resolving interstate boundary conflict). When such disputes arise, it is clear under our federal system that laws of one State cannot impose upon the sovereign rights and interests of another. The Constitution, by Art. III, § 2, explicitly extends the judicial power of the United States to controversies between a State and another State or its citizens, and this Court, in equitably resolving such disputes, has developed a body of "what may not improperly be called interstate common law." *Kansas* v. *Colorado,* 206 U. S., at 98.

Long before the 1972 decision in *Illinois* v. *Milwaukee,* federal common law enunicated by this Court assured each State the right to be free from unreasonable interference with its natural environment and resources when the interference stems from another State or its citizens. *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230, 237–239 (1907); *Missouri* v. *Illinois,* 200 U. S. 496, 520, 526 (1906). See *New Jersey* v. *City of New York,* 283 U. S. 473 (1931); *New York* v. *New Jersey,* 256 U. S. 296 (1921). The right to such federal protection is a consequence of each State's entry into the Union and its commitment to the Constitution. In the words of Justice Holmes, speaking for the Court:

"When the States by their union made the forcible

---

mon Law: Judicially Established Effluent Standards as a Remedy in Federal Nuisance Actions, 7 B. C. Env. Aff. L. Rev. 293 (1978).

abatement of outside nuisances impossible to each, they did not thereby agree to submit to whatever might be done. They did not renounce the possibility of making reasonable demands on the ground of their still remaining *quasi*-sovereign interests; and the alternative to force is a suit in this court." *Georgia* v. *Tennessee Copper Co.,* 206 U. S., at 237.

This Court also has applied federal common law where federally created substantive rights and obligations are at stake. Thus, the Court has been called upon to pronounce common law that will fill the interstices of a pervasively federal framework, or avoid subjecting relevant federal interests to the inconsistencies in the laws of several States. *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448, 456–457 (1957); *United States* v. *Standard Oil Co.,* 332 U. S. 301, 305 (1947); *Clearfield Trust Co.* v. *United States,* 318 U. S. 363, 366–367 (1943); *D'Oench, Duhme & Co.* v. *Federal Deposit Ins. Corp.,* 315 U. S. 447 (1942). If the federal interest is sufficiently strong, federal common law may be drawn upon in settling disputes even though the statute or Constitution alone provides no precise answer to the question posed. See, *e. g., Textile Workers* v. *Lincoln Mills,* 353 U. S., at 458; *Clearfield Trust Co.* v. *United States,* 318 U. S., at 368–370. See generally *United States* v. *Little Lake Misere Land Co.,* 412 U. S. 580, 593 (1973) ("the inevitable incompleteness presented by all legislation means that interstitial federal lawmaking is a basic responsibility of the federal courts").

Each of these sources of federal common law was recognized in *Illinois* v. *Milwaukee.* The Court there concluded that the common law of interstate nuisance supplied the requisite federal-question jurisdiction to bring an action in District Court. In so deciding, the Court reasoned that it was appropriate for federal courts to fashion federal common law "where there is an overriding federal interest in the need for a uniform rule of decision or where the controversy

touches basic interests of federalism." 406 U. S., at 105, n. 6. The Court relied heavily upon interstate air pollution and water allocation cases where the complaining party was a State invoking the Court's original jurisdiction. *Id.,* at 104–106. In addition, it recounted the history of federal interstate water quality legislation and suggested that the abiding federal interest in the purity of interstate waters justified application of federal common law. *Id.,* at 101–103. Significantly, the Court found no barrier to federal common law despite the number of federal statutes and regulations that already provided remedies to abate pollution in interstate waters. *Id.,* at 103.

Thus, quite contrary to the statements and intimations of the Court today, *ante,* at 323, 325, 327, n. 19, *Illinois* v. *Milwaukee* did not create the federal common law of nuisance. Well before this Court and Congress acted in 1972, there was ample recognition of and foundation for a federal common law of nuisance applicable to Illinois' situation.[4] Congress cannot be presumed to have been unaware of the relevant common-law history, any more than it can be deemed to have been oblivious to the decision in *Illinois* v.

---

[4] This Court had not previously indicated that the federal common law of nuisance provided a basis for federal-question jurisdiction under 28 U. S. C. § 1331. But see *Texas* v. *Pankey,* 441 F. 2d 236 (CA10 1971). As recently as 1971, however, the Court had confirmed the existence of its original jurisdiction to consider a nuisance action brought by one State to vindicate its own sovereign interests or the interests of its citizens as a whole. See *Ohio* v. *Wyandotte Chemicals Corp.,* 401 U. S. 493, 496 (citing cases discussed *supra,* at 335). The significance of *Wyandotte* was the Court's refusal for prudential reasons to exercise the original jurisdiction that concededly obtained. 401 U. S., at 499–505. The additional observation that "[s]o far as it appears from the present record, an action such as this, if otherwise cognizable in federal district court, would have to be adjudicated under state law," *id.,* at 498–499, n. 3 (emphasis added), was explained by the Court one year later as "based on the preoccupation of that litigation with public nuisance under Ohio law." *Illinois* v. *Milwaukee,* 406 U. S., at 102, n. 3.

*Milwaukee*, announced six months prior to the passage of the Federal Water Pollution Control Act Amendments of 1972 (Act or Amendments), 86 Stat. 816. The central question is whether, given its presumed awareness, Congress, in passing these Amendments, intended to prevent recourse to the federal common law of nuisance.

The answer to this question, it seems to me, requires a more thorough exploration of congressional intent than is offered by the Court. Congress had "spoken to" the particular problem of interstate water pollution as far back as 1888,[5] and in 1948 did so in a broad and systematic fashion with the enactment of the Water Pollution Control Act (also known as the Clean Water Act).[6] In *Illinois* v. *Milwaukee*, the Court properly regarded such expressions of congressional intent as not an obstacle but an incentive to application of the federal common law. 406 U. S., at 102–103. The fact that Congress in 1972 once again addressed the complicated and difficult problem of purifying our Nation's waters should not be taken as presumptive evidence, let alone conclusive proof, that Congress meant to foreclose pre-existing approaches to controlling interstate water pollution.[7] Where the possi-

---

[5] See Act of June 29, 1888, 25 Stat. 209. See also Rivers and Harbors Appropriation Act of 1899, 30 Stat. 1121.

[6] Ch. 758, 62 Stat. 1155.

[7] The Court at this point, *ante*, at 314–315, would rely on *Arizona* v. *California*, 373 U. S. 546 (1963), and *Mobil Oil Corp.* v. *Higginbotham*, 436 U. S. 618 (1978). But those cases do not stand for the broad proposition announced today. In *Arizona* v. *California*, Congress had developed a formula for apportioning the limited waters of the Colorado River and directed the federal agency to implement the formula. In the face of this express congressional allocation, the Court declined to substitute its own notions of an equitable apportionment. 373 U. S., at 565. In *Mobil Oil Corp.* v. *Higginbotham*, the Court confronted a statute that had created a precise federal remedy where before there had been none. Since federal law, when the statute was passed, did not address wrongful death on the high seas, and the statute itself expressed no intent to preserve or create federal remedies, the Court acceded to the particularized judgment of Congress. 436 U. S., at 625. Unlike the statutes at issue in

ble extinction of federal common law is at issue, a reviewing court is obligated to look not only to the magnitude of the legislative action but also with some care to the evidence of specific congressional intent.[8]

## II

In my view, the language and structure of the Clean Water Act leave no doubt that Congress intended to preserve the federal common law of nuisance. Section 505 (e) of the Act reads:

> "Nothing in this section shall restrict any right which *any person* (or class of persons) may have under *any statute or common law* to seek enforcement of any effluent standard or limitation *or to seek any other relief* (including relief against the Administrator or a State agency)." 33 U. S. C. § 1365 (e) (emphasis added).

The Act specifically defines "person" to include States, and thus embraces respondents Illinois and Michigan. § 502 (5),

---

those two cases, the 1972 Act addressed a broad and complex subject to which state and federal law had previously spoken, and in doing so recognized and encouraged many different approaches to controlling water pollution. See discussion in Part II, *infra*.

[8] Inevitably, a federal court must acknowledge the tension between its obligation to apply the federal common law in implementing an important federal interest, and its need to exercise judicial self-restraint and defer to the will of Congress. Congress, of course, may resolve this tension by making it known that flexible and creative judicial response on a case-by-case basis must yield to an interest in certainty under a comprehensive legislative scheme. At the same time, the fact that Congress *can* properly check the courts' exercise of federal common law does not mean that it has done so in a specific case. This Court is no more free to disregard expressions of legislative desire to preserve federal common law than it is to overlook congressional intent to curtail it. Indeed, the Court has admonished that statutes will not be construed in derogation of the common law unless such an intent is clear. *Isbrandtsen Co.* v. *Johnson*, 343 U. S. 779, 783 (1952) (citing cases). To say that Congress "has spoken," *ante*, at 316, n. 8, is only to begin the inquiry; the critical question is what Congress has said.

33 U. S. C. § 1362 (5). It preserves their right to bring an action against the governmental entities who are charged with enforcing the statute. Most important, as succinctly stated by the Court of Appeals in this case: "There is nothing in the phrase 'any statute or common law' that suggests that this provision is limited to state common law." 599 F. 2d, at 163. To the best of my knowledge, every federal court that has considered the issue has concluded that, in enacting § 505 (e), Congress meant to preserve federal as well as state common law.[9]

Other sections of the Clean Water Act also support the conclusion that Congress in 1972 had no intention of extinguishing the federal common law of nuisance. Although the Act established a detailed and comprehensive regulatory system aimed at eliminating the discharge of pollutants into all navigable waters, it did not purport to impose a unitary enforcement structure for abating water pollution. In par-

---

[9] *E. g., National Sea Clammers Assn.* v. *City of New York,* 616 F. 2d 1222, 1233, n. 31 (CA3), cert. granted, 449 U. S. 917 (1980); *California Tahoe Regional Planning Agency* v. *Jennings,* 594 F. 2d 181, 193 (CA9), cert. denied, 444 U. S. 864 (1979). See also *Illinois* v. *Outboard Marine Corp.,* 619 F. 2d 623, 626 (CA7 1980), cert. pending, No. 80–126; *United States* v. *Atlantic-Richfield Co.,* 478 F. Supp. 1215, 1218–1220 (Mont. 1979); *United States ex rel. Scott* v. *United States Steel Corp.,* 356 F. Supp. 556, 559 (ND Ill. 1973); *United States* v. *Ira S. Bushey & Sons, Inc.,* 346 F. Supp. 145, 149 (Vt. 1972), aff'd, 487 F. 2d 1393 (CA2 1973), cert. denied, 417 U. S. 976 (1974).

The Court relies on *Committee for Consideration of Jones Falls Sewage System* v. *Train,* 539 F. 2d 1006, 1009, n. 9 (CA4 1976), in criticizing the "unlikely assumption" that § 505 (e) preserved anything other than "the more routine state common law." *Ante,* at 329. *Jones Falls* offers no support for this criticism, since it concerned only *intra*state pollution of navigable waters. Indeed, the court there assumed the continued applicability of federal common law where a State sought to vindicate its rights in an interstate controversy, 539 F. 2d, at 1010, but concluded that because the controversy was entirely local, the state common law of nuisance preserved by § 505 (e) furnished the relevant common-law remedy.

ticular, Congress expressly provided that the effluent limitations promulgated under the Act do not preclude any State from establishing more stringent limitations. § 510, 33 U. S. C. § 1370. It also made clear that federal officers or agencies are not foreclosed from adopting or enforcing stricter pollution controls and standards than those required by the Act. § 511 (a), 33 U. S. C. § 1371 (a).

Thus, under the statutory scheme, any permit issued by the EPA or a qualifying state agency does not insulate a discharger from liability under other federal or state law.[10] To the contrary, the permit granted pursuant to § 402 (k), 33 U. S. C. § 1342 (k), confers assurances with respect to certain specified sections of the Act, but the requirements under other provisions as well as separate legal obligations remain unaffected. See *EPA* v. *State Water Resources Control Board,* 426 U. S. 200, 205 (1976). Congress plainly anticipated that dischargers might be required to meet standards more stringent than the minimum effluent levels approved by the EPA. Those more stringent standards would necessarily be established by other statutes or by common law. Because the Act contemplates a shared authority between the Federal Government and the individual States, see, *e. g.,* § 101 (b), 33 U. S. C. § 1251 (b) (1976 ed., Supp. III), it is entirely understandable that Congress thought it neither imperative nor desirable to insist upon an exclusive approach to the improvement of water quality.[11]

The Court offers three responses to this view of congressional intent. With regard to the language of § 505 (e), it attributes critical significance to the words "this section,"

---

[10] Cf. *New Jersey* v. *City of New York,* 283 U. S. 473, 477, 482–483 (1931) (compliance with permit requirements of federal statute does not bar injunctive relief in federal nuisance action).

[11] It is significant that elsewhere in the statute, Congress expressly manifested an intention to foreclose the applicability of other laws. See § 312 (f)(1), 33 U. S. C. § 1322 (f)(1). Congress thus demonstrated that it was capable of pre-empting a particular area when it chose to do so.

and concludes that Congress meant only to assure that the *citizen-suit provision* did not extinguish formerly available federal common-law actions. *Ante,* at 328–330. The Court thus reads § 505 (e) as though Congress had said that " 'this section' does not take away any pre-existing remedies, but the remainder of the statute does." This is an extremely strained reading of the statutory language,[12] and one that is at odds with the manifest intent of Congress to permit more stringent remedies under both federal and state law. See §§ 510, 511, 33 U. S. C. §§ 1370, 1371. If § 505 (e) is to be construed as the Court suggests, then it authorizes the abrogation of *all* pre-existing rights, both statutory and common law, in the area of water pollution control. The Court's construction therefore, would render suspect, if not meaningless, the Act's other provisions. Rather than interpreting § 505 (e) as a license to supplant all legal remedies outside the Act itself, I would construe the reference to "this section" as simply preventing pre-existing rights of action from being subjected to the procedural and jurisdictional limitations imposed by § 505 on persons who would sue under the Act.

The Court also relies on certain language contained in the legislative history of the 1972 Amendments. *Ante,* at 317–319. Based on the remarks of several of the Act's proponents that this was the most comprehensive water pollution bill prepared to date, the Court finds a strong congressional suggestion that there is no room for improvement through the federal common law. But there is nothing talismanic about such generalized references. The fact that legislators may characterize their efforts as more "comprehensive" than prior legislation hardly prevents them from authorizing the continued existence of supplemental legal and equitable solutions to the broad and serious problem addressed.[13] More-

---

[12] The Court points to no other judicial decision that has construed the language of § 505 (e) in this fashion. See n. 9, *supra.*

[13] There is nothing new about federal law in this area being characterized by its proponents as comprehensive. Similar claims were made in

over, the Court ignores express statements of legislative intent that contradict its position. The Senate Report accompanying the 1972 legislation explicitly describes the congressional intent informing § 505 (e):

> "It should be noted, however, that the section would specifically preserve any rights or remedies under any other law. Thus, if damages could be shown, other remedies would remain available. Compliance with requirements under this Act would not be a defense to a common law action for pollution damages." S. Rep. No. 92–414, p. 81 (1971), reprinted in 2 Legislative History of the Water Pollution Control Act Amendments of 1972 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress), Ser. No. 93–1, p. 1499 (1973) (Leg. Hist.).[14]

This deliberate preservation of all remedies previously available at common law makes no distinction between the common law of individual States and federal common law. Indeed, the legislative debates indicate that Congress was specifically aware of the presence of federal common law, and intended that it would survive passage of the 1972 Amendments. In one particularly revealing colloquy on the Senate floor, Senator Griffin noted the pendency of a suit challenging the dumping of iron ore pollutants into Lake

---

advancing the legislation in place when *Illinois* v. *Milwaukee* was decided. See, *e. g.*, S. Rep. No. 462, 80th Cong., 1st Sess., 1 (1947) ("The purpose of the bill (S. 418) is to provide a comprehensive program for preventing, abating, and controlling water pollution . . ."); 94 Cong. Rec. 8195 (1948) ("The bill provides that the Surgeon General shall encourage a comprehensive program for the control of stream pollution between the States and to secure their cooperation in combating this evil." (Rep. Auchincloss)). That a different Congress, 24 years later, deemed this legislation inadequate (see *ante*, at 318, n. 10), carries no more significance than the postmortems one may expect from the 104th Congress concerning the 1972 Act.

[14] See also H. R. Rep. No. 92–911, pp. 132, 134 (1972), reprinted in 1 Leg. Hist. 819, 821.

Superior. 1 Leg. Hist. 191. See *Reserve Mining Co. v. EPA*, 514 F. 2d 492 (CA8 1975) (en banc). The Senator inquired whether the suit, which was based in part on the federal common law of nuisance,[15] would be affected by passage of the 1972 Amendments. Senators Muskie [16] and Hart each responded that the new legislation would not affect or hinder "the suit now pending against the Reserve Mining Co., under the Refuse Act of 1899 . . . [,] the existing Federal Water Pollution Control Act or *other law*." 1 Leg. Hist. 211 (Sen. Hart) (emphasis added).[17]

---

[15] *Id.*, at 191. See *Reserve Mining Co. v. EPA*, 514 F. 2d, at 501.

[16] The Court previously has observed that Senator Muskie was perhaps the Act's primary author, and has credited his views accordingly. See *E. I. du Pont de Nemours & Co. v. Train*, 430 U. S. 112, 129 (1977); *EPA v. National Crushed Stone Assn.*, 449 U. S. 64, 71, n. 10 (1980).

[17] See 1 Leg. Hist. 191–194. See also *id.*, at 248 (colloquy between Reps. Dingell and Wright); *id.*, at 252 (Rep. Dingell). The Court, *ante*, at 329–332, elaborately attempts to minimize the fact, recognized by all participants in the Senate colloquy, that the *Reserve Mining* case involved a common-law nuisance count. In seeking assurances that the pending litigation would not be "adversely affect[ed]," Senator Griffin stated explicitly that the lawsuit was based on two pre-existing federal statutes and the common law of public nuisance. 1 Leg. Hist. 190–191. Senator Muskie's final response to Senator Griffin indicated his understanding that the suit as a whole would not be affected by the Act. *Id.*, at 194. Moreover, Senator Hart's reference to "other law" in the *Reserve Mining* case could have pertained only to the common-law counts he had not already mentioned.

This entire discussion of the *Reserve Mining* case was initiated due to Senator Griffin's concern over the possible retroactive effect of § 402 (k) on litigation already commenced. Senators Muskie and Hart, as well as the EPA, took the position that there would be no disruption of the pending action, which had been commenced in February 1972, three months prior to this action. In his letter to Senator Griffin, the EPA General Counsel added a caveat that has obvious significance here:

"[I]t is reasonable to conclude that the courts will not interpret any legislation to deprive them of jurisdiction of pending litigation in the absence of clear and explicit language. There is no such clear and explicit language to this effect in the pending bill." 1 Leg. Hist. 193.

Finally, the Court attaches significance to the fact that the 1972 Amendments provided a more rigorous administrative mechanism for addressing interstate controversies. *Ante,* at 325–326. The Court evidently regards the provision of a new administrative abatement process as a type of jurisdictional requirement, for it criticizes Illinois' failure to invoke the mechanism before seeking any form of judicial relief. *Ante,* at 326. Even if this were the case, the new notice and hearing procedure became available only two years after Illinois commenced this action. There is no suggestion that Illinois failed to pursue administrative abatement under the *then-*applicable federal statute. Indeed, it is undisputed that Illinois made prolonged and diligent efforts to secure administrative relief.[18] Nonetheless, the Court in effect concludes that it is not enough to exhaust administrative remedies that existed at the time a common-law action was initiated; a complainant must also be prepared to pursue new and wholly unforeseen administrative avenues even as it seeks a final judgment in federal court. I am aware of no case that adopts so harsh an approach to the pursuit of administrative remedies, and I see no basis for imposing such a requirement in this context.

Moreover, contrary to what the Court implies, Congress never intended that failure to participate in the § 402 administrative process would serve as a jurisdictional bar. Nothing in the language of § 402 suggests that a neighboring State's participation in the permit-granting process is anything other than voluntary and optional.[19] Indeed, the Con-

---

[18] Brief for Respondent Illinois 8–9 (describing unsuccessful pursuit of administrative remedies); see 599 F. 2d 151, 158 (CA7 1979) (describing administrative processes under statute before 1972).

[19] As the Court observes, the scheme established by § 402 "provides *a forum* for the pursuit" of a neighboring State's claim that the controls to be imposed are not sufficiently stringent. *Ante,* at 326 (emphasis added). There is nothing inconsistent about making this forum available, and encouraging its use, while at the same time permitting the pursuit of other

ference Committee considering the 1977 amendments to the Act was presented with a proposal that *would* have made such participation a jurisdictional prerequisite.[20] This proposal was not adopted by the Conference Committee, and among its opponents was the Department of Justice. In a letter sent to all conferees, the Department made clear its understanding that, absent such an amendment, the federal common law would continue to be relied upon in the national effort to control water pollution.[21]

---

remedies. If there are problems with the efficiency of such an approach, Congress of course is free to modify the statutory scheme.

[20] Following the District Court's ruling in this case, Congressman Aspin of Wisconsin proposed an amendment to § 402:

"Sec. (a) Section 402 of the Federal Water Pollution Control Act is amended by adding at the end thereof the following new subsection:

" '(1) In any case where a State whose waters may be affected by the issuance of a permit under this section fails to submit any recommendations to the permitting State as authorized in subsection (b)(5) of this section, the State failing to make such a submission (and its persons) shall not have standing to bring any action to abate (in whole or in part) as a nuisance under common law in any court of the United States any discharge which would have been the subject of such recommendations.'

"(b) The amendment made by subsection (a) of this section shall be applicable to any action brought to abate (in whole or in part) as a nuisance under common law in any court of the United States any discharge of pollutants, unless a final decision has been rendered prior to the effective date of this amendment." App. to Brief for Respondent Illinois 98a.

The proposal was made after both Houses had debated and passed the 1977 amendments to the Act but before the Conference Committee had met. In his testimony before a House Committee considering the pending bill, Congressman Aspin voiced concern over the recent District Court decision, and suggested that Congress "explicitly express its belief that federal common law has been pre-empted." Hearings before the House Committee on Public Works and Transportation on H. R. 3199, 95th Cong., 1st Sess., 328 (1977).

[21] Letter to Senator Muskie from James Moorman, Assistant Attorney General, Land and Natural Resources Division, Oct. 18, 1977:

"The common law serves to give an injured party who may have been neglected by the statute or by an overburdened enforcing agency a form

The Justice Department's position on the survival of federal common law is consistent with the stance taken by the EPA both in this litigation and throughout the period since the 1972 Amendments were enacted. The EPA in fact has relied upon the federal common law of nuisance in addition to the remedies available under the statute in seeking to protect water quality.[22] As the agency charged with enforcing and implementing the Act, EPA's interpretation of the scope and limits of that statute is entitled to considerable deference. See *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965). Where, as here, the agency has publicly and consistently acted upon its interpretation, congressional silence is not without significance, particularly since this area has been a subject of frequent and intense legislative attention. And where, as here, the agency's continued reliance on federal common law is firmly grounded in the language and structure of the statute, I fail to see how the Court can so lightly disregard its interpretation.

---

of redress. *There is no good argument for removing this opportunity for remedy.* The basic principle of the common law of public nuisance is that one is liable for damages caused to another where the benefit of one's action does not outweigh the harm. This is a sound principle. Where it can be shown that pollution has injured someone it should not be a sufficient defense to claim that the generalized standards of a statute have been complied with. Polluters should properly be held to a standard that holds them liable for unnecessarily injuring others and not simply for violating the statutory law. The number of cases under the common law will inevitably be small but where they are meritorious there is no basis for abolishing this cause of action." (Emphasis added.) App. to Brief for Respondent Illinois 101a–103a.

[22] See, *e. g., Illinois* v. *Outboard Marine Corp.*, 619 F. 2d 623 (CA7 1980), cert. pending, No. 80–126; *United States* v. *Hooker Chemicals & Plastic Corp.*, (WDNY No. 79–990, filed Dec. 20, 1979). Several courts have held that the United States can state a claim for relief under the federal common law of nuisance. See, *e. g., United States* v. *Ira S. Bushey & Sons, Inc.*, 346 F. Supp. 145 (Vt. 1972), aff'd, 487 F. 2d 1393 (CA2 1973), cert. denied, 417 U. S. 976 (1974); *United States* v. *Solvents Recovery Serv.*, 496 F. Supp. 1127 (Conn. 1980).

## III

Assuming that Congress did preserve a federal common law of nuisance, and that respondents properly stated federal common-law claims for relief, there remains the question whether the particular common law applied here was reasonable. Because of its ruling, the Court does not explicitly address this question. Nonetheless, in its detailed review of respondents' claims, the Court in effect concludes that the federal common law applied by the District Court and the Court of Appeals was defective. In particular, the Court asserts that federal courts may not exceed the statutory minimum approach sanctioned by Congress, see *ante*, at 323, and may not use federal power to impose a State's more stringent pollution limitation standards upon out-of-state polluters. See *ante*, at 327–328. In contrast, I believe the courts below acted correctly in both respects.

As the Court of Appeals properly recognized, 599 F. 2d, at 164, the determination by Congress to preserve rights of action at federal common law did not grant federal courts the freedom to disregard the statutory and regulatory structure approved by Congress. We noted in *Illinois* v. *Milwaukee* that "the various federal environmental protection statutes will not necessarily mark the outer bounds of the federal common law, [but] they may provide useful guidelines in fashioning such rules of decision." 406 U. S., at 103, n. 5. These guidelines, however, bear primarily on the problems of proof faced by the parties; they do not determine the exclusive source of the law to be applied.

In this instance, problems of proof arise under a familiar form of common-law action. A public nuisance involves unreasonable interference with a right common to the general public.[23] Drawing on the Court's decision in *Georgia* v. *Ten-*

---

[23] Restatement (Second) of Torts § 821B (Tent. Draft No. 16, 1970). See generally W. Prosser, Law of Torts 583–591 (4th ed. 1971); W. Rodgers, Environmental Law 102–107 (1977).

*nessee Copper Co.*, 206 U. S., at 238–239, the Court of Appeals concluded that nuisance is established at federal common law only if "the defendant is carrying on an activity that is causing an injury or significant threat of injury to some cognizable interest of the complainant." 599 F. 2d, at 165. Whether a particular interference qualifies as unreasonable, whether the injury is sufficiently substantial to warrant injunctive relief, and what form that relief should take are questions to be decided on the basis of particular facts and circumstances.[24] The judgments at times are difficult, but they do not require courts to perform functions beyond their traditional capacities or experience.[25]

When choosing the precise legal principles to apply, common-law courts draw upon relevant standards of conduct available in their communities. Where federal common law is concerned, "th[is] choice-of-law task is a federal task for federal courts." *United States* v. *Little Lake Misere Land Co.*, 412 U. S., at 592. At the same time, while federal law

---

[24] See Restatement (Second) of Torts § 821B; Prosser, at 602–606; Note, Federal Common Law in Interstate Water Pollution Disputes, 1973 U. Ill. Law Forum 141, 154–158.

[25] See, *e. g., Reserve Mining Co.* v. *EPA*, 514 F. 2d 492, 506–540 (CA8 1975) (en banc); *United States* v. *Armco Steel Corp.*, 333 F. Supp. 1073, 1079–1084 (SD Tex. 1971); *Commonwealth* v. *Barnes & Tucker Co.*, 455 Pa. 392, 319 A. 2d 871 (1974); *Boomer* v. *Atlantic Cement Co.*, 26 N. Y. 2d 219, 257 N. E. 2d 870 (1970); *People ex rel. Stream Control Comm'n* v. *Port Huron*, 305 Mich. 153, 9 N. W. 2d 41 (1943); *Board of Comm'rs* v. *Elm Grove Mining Co.*, 122 W. Va. 442, 9 S. E. 2d 813 (1940); *Fink* v. *Board of Trustees*, 71 Ill. App. 2d 276, 218 N. E. 2d 240 (1966); *Murphysboro* v. *Sanitary Water Board*, 10 Ill. App. 2d 111, 134 N. E. 2d 522 (1956). Thus, there can be no merit to the Court's suggestion, *ante*, at 325, that the technical difficulty of the subject matter renders inappropriate any recourse to the common law. The complexity of a properly presented federal question is hardly a suitable basis for denying federal courts the power to adjudicate. Indeed, the expert agency charged with administering the Act has not hesitated to invoke this common-law jurisdiction where appropriate.

controls a particular question or problem, state law may furnish an appropriate measure of the content of this federal law. See, *e. g., Board of Comm'rs* v. *United States,* 308 U. S. 343, 349–352 (1939). See also *Textile Workers* v. *Lincoln Mills,* 353 U. S., at 457; *Clearfield Trust Co.* v. *United States,* 318 U. S., at 367. What the Court today characterizes as the inappropriate application of more stringent standards from Illinois state law in fact reflects a federal common-law court's proper exercise of choice-of-law discretion.[26]

The Act sets forth certain effluent limitations. As did the Court of Appeals,[27] a court applying federal common law in a given instance may well decline to impose effluent limitations more stringent than those required by Congress, because the complainant has failed to show that stricter standards will abate the nuisance or appreciably diminish the threat of injury. But it is a far different proposition to pronounce, as does the Court today, that federal courts *"lack authority* to impose more stringent effluent limitations under federal common law than those imposed" under the statutory scheme. *Ante,* at 320 (emphasis added). The authority of the federal courts in this area was firmly established by the decision in *Illinois* v. *Milwaukee.* In delineating the legitimate scope of the federal common law, the Court there expressly noted the relevance of state standards, adding that "a State with high water-quality standards *may well ask that its strict standards be honored and that it not be compelled to lower itself* to the more degrading standards of a neighbor." (Emphasis added.) 406 U. S., at 107. The Act attributes comparable respect to the stricter effluent limita-

---

[26] Moreover, that the District Court may have abused its discretion is no basis for concluding that state-law standards are irrelevant to the federal common law.

[27] 599 F. 2d, at 167–168. See also unpublished order of the Court of Appeals, App. to Pet. for Cert. B–2 to B–4; unpublished findings of fact and conclusions of law of the District Court, *id.,* at F–1 to F–30.

tion levels imposed by individual States. § 510, 33 U. S. C. § 1370. Since both the Court and Congress fully expected that neighboring States might differ in their approaches to the regulation of the discharge of pollutants into their navigable waters, it is odd, to say the least, that federal courts should now be deprived of the common-law power to effect a reconciliation of these differences.

The problem of controlling overflows is particularly amenable to application of this common-law authority. As the courts below found, see 599 F. 2d, at 167–168, the sewer systems operated by petitioners include some 239 bypass or overflow points from which raw sewage is discharged directly into Lake Michigan or into rivers that flow into the lake. In a single month in 1976, discharge from 11 of the 239 discrete overflow points amounted to some 646 million gallons of untreated sewage. *Ibid.* The trial court determined that these untreated fecal wastes, containing billions of pathogenic bacteria and viruses, are periodically transported by prevailing currents into the Illinois waters of Lake Michigan. The court further found that the presence of these pathogens in Illinois waters poses a significant risk of injury to Illinois residents, threatening to contaminate drinking water supplies and infect swimmers.[28]

Pursuant to the Act, publicly owned treatment works then in existence must apply "secondary treatment as defined by the Administrator" as of July 1, 1977. §§ 301 (b)(1)(B), 304 (d)(1), 33 U. S. C. §§ 1311 (b)(1)(B), 1314 (d)(1).[29]

---

[28] There is little to be gained by undertaking an extensive review of the record evidence on these points. The Court of Appeals did this and concluded that the findings at trial were not clearly erroneous. I see no reason to disturb the Court of Appeals' view of the evidence.

[29] Congress in 1977 amended the Act to permit the Administrator to grant extensions of the 1977 deadline under certain conditions. See Pub. L. 95–217, §§ 44, 45, 91 Stat. 1584, 33 U. S. C. §§ 1311 (h) and (i) (1976 ed., Supp. III).

352

No provision of the Act explicitly addresses the discharge of raw sewage into public waters from overflow points. Indeed, Congress in 1977 expressed concern that combined sewer overflows were a significant source of untreated sewage polluting the Nation's waters, and it commissioned a study of the problem with a view toward possible further legislation.[30] While the Administrator has issued regulations that define secondary treatment in terms of certain minimum levels of effluent quality, he also has acknowledged that combined sewer overflows raise special concerns that must be resolved on a case-by-case basis.[31] This record demonstrates that both Congress and the Administrator recognized the inadequacy of the statutory scheme. It surely does not show that these responsible parties intended no role for the federal common law.

The lower courts in this case carefully evaluated the regulatory systems developed by each State to deal with the overflow problem. It was determined that the standards promulgated under the Illinois regulatory scheme were more stringent than those developed by the Wisconsin agency or imposed on petitioners under the Wisconsin state-court judgment. See 599 F. 2d, at 171–173. The District Court's order imposed standards that reflected the more rigorous approach adopted in Illinois to restore and protect Illinois

---

[30] Pub. L. 95–217, § 70, 91 Stat. 1608. See S. Rep. No. 95–370, p. 81 (1977). The study was issued in October 1978. See EPA, Report to Congress on Control of Combined Sewer Overflow in the United States (MCD–50, 1978).

[31] See 40 CFR §§ 133.102 and 133.103 (1980). In addition, sewers and pipes that do not lead to a treatment facility are not considered "publicly owned treatment works" for purposes of § 301, 33 U. S. C. § 1311. See 40 CFR § 122.3, p. 70 (1980). In the absence of technology-based treatment requirements for combined sewer overflows, the Administrator mandates an individualized analysis by each system that seeks federal assistance. See EPA, Benefit Analysis for Combined Sewer Overflow Control 3 (1979).

waters.[32] The Court of Appeals noted that Wisconsin had allowed petitioners more time in which to eliminate or "correct" the overflow problem, but that petitioners conceded the feasibility of complying with the District Court's deadlines. *Id.*, at 172, 177. In my view, the Court of Appeals acted responsibly and in a manner wholly consistent with the common-law jurisdiction envisioned by the Court in *Illinois* v. *Milwaukee*.

## IV

There is one final disturbing aspect to the Court's decision. By eliminating the federal common law of nuisance in this area, the Court in effect is encouraging recourse to state law wherever the federal statutory scheme is perceived to offer inadequate protection against pollution from outside the State, either in its enforcement standards or in the remedies afforded. This recourse is now inevitable under a statutory scheme that accords a significant role to state as well as federal law. But in the present context it is also unfortunate, since it undermines the Court's prior conclusion that it is federal rather than state law that should govern the regulation of *inter*state water pollution. *Illinois* v. *Milwaukee*, 406 U. S., at 102. Instead of promoting a more uniform federal approach to the problem of alleviating interstate pollution, I fear that today's decision will lead States to turn to their

---

[32] While the Wisconsin permit-granting agency and the Wisconsin state courts devised one approach to regulating combined sewer overflows in the Milwaukee system, this alone does not establish that the applicable legal standard under federal common law is the one adopted by Wisconsin. To hold otherwise would in effect nullify a neighboring State's more stringent pollution control standards even in circumstances where, as here, a significant risk of harm to the neighboring State's citizenry has been established; if a polluting State is not violating its own approved standards, a neighboring State with higher standards then has no recourse under the Act. It is in precisely this context that the Court recognized the significance of federal common law. *Illinois* v. *Milwaukee*, 406 U. S., at 107–108.

own courts for statutory or common-law assistance in filling the interstices of the federal statute. Rather than encourage such a prospect, I would adhere to the principles clearly enunciated in *Illinois* v. *Milwaukee,* and affirm the judgment of the Court of Appeals.