# CISSNA v. STATE OF TENNESSEE.

## ERROR TO THE SUPREME COURT OF THE STATE OF TENNESSEE.

No. 20.  Argued November 10, 1916; restored to docket for reargument December 11, 1916; reargued October 9, 10, 1917.—Decided March 11, 1918.

If the state supreme court treats federal questions as necessarily involved and to reach its judgment necessarily decides them adversely to the plaintiff in error, this court has jurisdiction to review them, although not specially characterized as federal questions by the plaintiff in error in the state courts.

This court has jurisdiction to review a judgment of the supreme court of a State where the issues as to whether lands in question were owned by the State, and whether they, and alleged trespasses upon them, were within the State and so within the state court's jurisdiction, were determined affirmatively through a location of the state boundary based upon interpretation of various treaties and acts of Congress.

Whether two States of the Union, either by long acquiescence in a

practical location of their common boundary or by agreement other-
wise evidenced, have changed the limits of their jurisdiction as laid
down by the authority of the general government in treaty or statute,
is in its nature a federal question.

Whether the state court has correctly followed the rules of erosion,
accretion or avulsion applicable to interstate boundary streams so as
to give proper effect to treaties and acts of Congress establishing a
river as an interstate boundary, is a question of federal law.

Upon the merits, which concern the location of the boundary between
Tennessee and Arkansas in the Mississippi River, this case is de-
cided upon the authority of *Arkansas* v. *Tennessee, ante,* 158.

119 Tennessee, 47, reversed.

THE case is stated in the opinion.

*Mr. Caruthers Ewing* for plaintiff in error.

*Mr. John P. Bullington,* with whom *Mr. Frank. M.
Thompson,* Attorney General of the State of Tennessee,
was on the briefs, for defendant in error.

MR. JUSTICE PITNEY delivered the opinion of the court.

The State of Tennessee sued Cissna and others in a
court of equity of that State, setting up ownership by the
State of that portion of the dry lands formerly a part of
the bed of the Mississippi River which lay between low-
water mark on the Tennessee side and the middle of the
river as it flowed prior to the change in the channel made
in the year 1876 by the opening of the Centennial Cut-off;
alleging that the defendant Cissna claiming ownership,
but having none, and the Muncie Pulp Company acting
under him, were cutting and removing timber from a
particularly described portion of those lands; and praying
for an injunction against further acts of trespass and
against the removal of the timber cut, and a recovery of
the value of the timber. Cissna pleaded in abatement that
the land described in the bill, except a small portion to

which he disclaimed title, was in the State of Arkansas and not in the State of Tennessee, and hence that the court had no jurisdiction over the controversy. His codefendant having raised a similar issue, the cause came on to be heard before a chancellor, who sustained the pleas to the jurisdiction and ordered that the bill be dismissed. Upon appeal, the Supreme Court of Tennessee, disregarding the form of the pleadings, treated the action as brought to recover the land as well as to stay waste in cutting and removing timber; and deeming that the question of jurisdiction which depended upon the location of the boundary line between Tennessee and Arkansas and the question of the right of the former State to recover the land were practically the same question, considered them together. The facts bearing upon the location of the boundary, recited in the opinion of the court, were substantially the same as those upon which this court passed in the boundary suit of *Arkansas* v. *Tennessee*, No. 4 Original, recently decided, *ante*, 158. The state court held, contrary to the rule laid down by this court in *Iowa* v. *Illinois*, 147 U. S. 1, and still adhered to, that the boundary line did not follow the middle of the channel of commerce, but was fixed and defined as "a line along the middle of the main channel of the river equidistant from the visible and permanent banks confining its waters." The court found that the change made in the channel in the year 1876 at Centennial Cut-off was an avulsion, and declared that "the limits of Tennessee and Arkansas, their respective rights in the abandoned channel, and those of individuals who owned lands lying and abutting upon it, all remained as they were before the formation of the new channel." But, not carrying this into effect, it concluded that at the place where the lands sued for are situate the correct boundary between the States was midway between the banks of the river as they existed in the year 1823 as shown by the Humphreys map, notwith-

standing the fact that between that date and the time of the cut-off the river had gradually encroached upon the Tennessee shore, to a large extent in the aggregate; the court holding that the effect of the avulsion was to press back the line between the two States so as to restore to Tennessee what it held before the erosions upon its banks. And since it appeared that complainant had sued only for the land lying on the hither side of the middle of the channel as it was in 1876, and therefore could not recover to the middle of the channel of 1823, the court, on remanding the cause for a hearing upon the answers of defendants, ordered that the bill might be amended so as to make the proper averments to enable the State to recover under the principles laid down in its opinion. *State* v. *Muncie Pulp Co.*, 119 Tennessee, 47.

The cause was remanded, the pleadings were amended, and the suit remained pending in the trial court, when the State of Arkansas filed its bill in this court against the State of Tennessee to settle the boundary line between these States along that part of the former bed of the Mississippi River which was left dry as a result of the avulsion of 1876, including the portion in dispute in the present case; this being the same action above mentioned as No. 4, Original. The pendency of that action was brought by Cissna to the attention of the trial court in the present case, and made the basis of an application for a stay of proceedings until the boundary line between the States should have been fixed and located by this court. This application was overruled and the cause proceeded, with the result that the chancellor made a decree against Cissna on the merits in conformity with the opinion of the Supreme Court, subject however to an accounting with respect to the amount and value of the timber cut and removed during the pendency of the suit. Upon appeal to the Supreme Court this decree was affirmed, with modifications not necessary to be mentioned, that

court ordered that a writ of possession be issued to place the complainant State in possession of the tract of land in controversy, and retained the case for an accounting respecting the value of the timber. By way of objection to the entry of a decree pursuant to the accounting that followed, Cissna again called the attention of the court to the boundary suit pending in this court, and prayed for a stay of proceedings in the suit against him upon the ground that any determination by that court not in accordance with the determination of this court would be void. This objection was overruled, a final judgment or decree went against him for upwards of $110,000, and the case was brought here by writ of error under § 237, Judicial Code (36 Stat. 1156, c. 231), before the amendment of September 6, 1916, c. 448, 39 Stat. 726.

It was first argued at the October Term, 1916, when, for reasons stated in 242 U. S. 195, it was restored to the docket, and thereafter was heard at the same time with the suit of *Arkansas* v. *Tennessee.*

Our jurisdiction is invoked upon the ground that the decision of the state court of last resort was adverse to the federal rights of plaintiff in error in two respects: (1) in overruling his prayer for a stay of proceedings to await the determination of the suit pending in this court to settle the boundary line between the States; and (2) in coming to an erroneous conclusion upon the merits of the question of the proper location of that boundary. We need not pass upon the first point, since we are of the opinion that we have jurisdiction on the second ground, and that the judgment under review must be reversed.

The record does not show that Cissna specially set up in the state courts any contention that the decision of the merits turned upon questions of federal law, except as this may appear by inference from the nature of the grounds upon which the decision was rested. But if the Supreme Court of the State treated federal questions as

necessarily involved and decided them adversely to plaintiff in error, and could not otherwise have reached the result that it did reach, it becomes immaterial to consider how they were raised. *Miedreich* v. *Lauenstein*, 232 U. S. 236, 243; *North Carolina R. R. Co.* v. *Zachary*, 232 U. S. 248, 257; *Mallinckrodt Works* v. *St. Louis*, 238 U. S. 41, 49.

The opinion of that court (119 Tennessee, 47) shows that it treated the question of jurisdiction presented by the pleas in abatement and the question of the title of the State of Tennessee to the lands in controversy as both dependent upon the location of the boundary, because the State claimed the lands as a sovereign under the same treaties and acts of Congress by which its western boundary was defined and established; and the court held that the location of this boundary depended upon the interpretation of the Treaty of 1783 between the United States and Great Britain (8 Stat. 80, 82, Art. II), the act of cession from North Carolina to the United States made in 1790 (1 Stat. 106, c. 6), the Treaty of 1795 between the United States and Spain (8 Stat. 138, 140, Art. IV), the Act of Congress of June 1, 1796, admitting Tennessee into the Union as a State (1 Stat. 491, c. 47), the Louisiana Purchase Treaty of 1803 (8 Stat. 200), and the Act of Congress of June 15, 1836, c. 100, 5 Stat. 50, admitting Arkansas as a State. Upon a consideration of the Treaty of 1783, which employed the expression "middle of the said River Mississippi" to define the western boundary of the United States, and interpreting this in view of the use of the same expression in the previous Treaty of 1763 between Great Britain, France, and Spain (3 Jenkinson's Treaties, 177), and declaring that the treaty with Spain, which provided that the western boundary of the United States should be "in the middle of the channel or bed of the river," was not only an interpretation of the former treaties, but superseded them, and construing the phrase "middle of the main channel," employed in the act ad-

mitting Arkansas, as introducing no new meaning, the court held that the expression "middle of the river," by true interpretation, meant not the middle of the channel of commerce, but a line midway between the visible and fixed banks of the stream, and that any general rule of international law to the contrary must yield to the intent which the court deemed to be expressed in the treaties and acts of Congress referred to.

Since the decision adverse to plaintiff in error turned so clearly and essentially upon questions of federal law, we have jurisdiction to review the resulting judgment. And as the conclusion reached by the state court upon the question of interpretation is directly opposed to that reached by us in *Arkansas* v. *Tennessee* upon a consideration of the same pertinent treaties and acts of Congress, we need only refer to our opinion in that case for a statement of the grounds upon which we hold that the state court erred.

Two additional errors entered into the judgment, so intimately connected with the question of interpretation as to be inseparable from it.

The first of these was a decision to the effect that the question of boundary had been settled by the duly constituted authorities of the two States, by judicial decisions, legislation, long acquiescence, exercise of jurisdiction, and other acts amounting to an agreement or convention defining the limit between the States to be the line midway between the visible banks of the river. Obviously, whether two States of the Union, either by long acquiescence in a practical location of their common boundary, or by agreement otherwise evidenced, have definitely fixed or changed the limits of their jurisdiction as laid down by the authority of the general Government in treaty or statute, is in its nature a federal question. We have stated briefly, in *Arkansas* v. *Tennessee*, the reasons why we are unable to concur with the state court in its decision upon this point.

The remaining error arose in the determination of the consequences of the avulsion of 1876. It is a part of the law of interstate boundaries, that where a running stream forms the boundary, if the bed and channel are changed by the natural and gradual processes of erosion and accretion, the boundary follows the varying course of the stream; while if the stream suddenly leaves its old bed and forms a new one, the resulting change of channel works no change of boundary, which remains in the middle of the old channel although no water be flowing in it. *Arkansas* v. *Tennessee, supra.* A correct application of this rule to changes in the Mississippi is necessary in order that proper effect may be given to the treaties and acts of Congress by which that river was established as an interstate boundary, and hence this is a question of federal law. The state court acknowledged the rule in theory, but departed from it in fact. Starting with the Humphreys map as showing the location of the banks of the river as they were in 1823, the date to which the earliest records related, and finding from the evidence that between that date and the time of the avulsion there had been gradual erosions from the Tennessee bank at the place where the land in controversy is situate, to an extent sufficient in the aggregate to increase the width of the river from a little less than a mile to between $1\frac{1}{4}$ and $1\frac{1}{2}$ miles, the court held that the subsequent emergence of the bed of the river at this place, consequent upon the avulsion of 1876, had the effect of pressing back the line between the States to the middle of the old channel as it ran in 1823, so as to restore to Tennessee what it held before the erosions from its banks. This result was reached by grafting upon the acknowledged rule as to boundary streams an exception deduced from the rule of the common law that lands once swallowed by the sea, if afterwards exposed by its recession, are restored to the former owner if they can be identified. As we have pointed out in

*Arkansas* v. *Tennessee,* it is a misapplication of this doc-
trine to treat it as forming an exception to the established
rule respecting the effect of erosion, accretion, and avul-
sion upon the course of a boundary stream.

We conclude, therefore, that the court erred in awarding
to the State of Tennessee a recovery of any land or dam-
ages for cutting and removing timber from any land
lying without the limits of the State as defined in our
opinion in *Arkansas* v. *Tennessee, supra,* being a line drawn
along the middle of the main channel of navigation of the
Mississippi River (as distinguished from a line midway
between the visible and fixed banks of the stream) as
it was at the time when the current ceased to flow therein
as a result of the avulsion of 1876, and without regard
to changes in the banks or channel that had occurred
through the natural and gradual processes of erosion and
accretion prior to the avulsion.

It results that the judgment of the state court must be
*Reversed, and the cause remanded for further proceedings
not inconsistent with this opinion.*