William B. UHLHORN, et al.,
Plaintiffs-Appellants,

v.

Charles Lee KELTNER, et al.,
Defendants-Appellees.

Supreme Court of Tennessee.

June 1, 1982.

William H. Luck, Memphis, for plaintiffs-appellants.

J. Houston Gordon, Covington, C.S. Carney & Robert C. Wilder, Ripley, for defendants-appellees.

## OPINION

HARBISON, Chief Justice.

This case involves title and right of possession to a crescent-shaped tract of approximately 430 acres in Tipton County, Tennessee. It is situated in the southerly portion of a region known as Centennial Island. It was once part of the bed of the Mississippi River. Ultimately it became valuable farm land as a result of what Mark Twain called a "freak" of the great river in suddenly changing its course in March, 1876, shortening the main channel by a distance of fifteen miles or more.[1]

The Uhlhorns, appellants here, and the Keltner and Glass families, appellees, claim the entire area under various theories hereafter discussed. After a lengthy trial in chancery, a jury found that none of the parties had held the entire tract adversely to the exclusion of the others for a sufficient time to establish a defensive title. The Chancellor and the Court of Appeals then awarded the tract to the appellees, and this Court granted further review.

A. *Background and Prior Litigation*

The area known as Centennial Island was formed as the result of a dramatic change of course by the Mississippi River in the early part of March 1876. The river formed

---

1. S.L. Clemens, *Life on the Mississippi*, ch. XXIX

the boundary between the States of Tennessee and Arkansas. The 1876 avulsion gave rise to extended litigation between the two states to establish their correct boundary. It also spawned massive litigation concerning private land titles. Most of these cases were disposed of at the trial court level, but some of them reached the appellate courts. The present is the most recent such suit to be appealed, but its outcome, in our opinion, is materially affected by litigation between the State of Tennessee and predecessors in title of the present litigants which terminated in 1930.

The litigation concerning the state boundaries culminated in an opinion of the Supreme Court of the United States in the case of *Arkansas v. Tennessee,* 246 U.S. 158, 38 S.Ct. 301, 62 L.Ed. 638 (1918). In that case the principal facts concerning the creation of Centennial Island were stipulated. In summary they are as follows:

Prior to the avulsion the Mississippi River had flowed southward past Dean's Island on the Arkansas side. It then made an abrupt westerly bend and flowed west, then north, then southerly around Island No. 37 (Tennessee). A lesser channel, called McKenzie Chute, passed between that island and the Tennessee shore. This chute and the main channel joined again at the southwestern tip of that island, opposite which the river turned again east and then north, forming what was called by river pilots the Devil's Elbow. It continued east and north around Brandywine Point or Island until it came within a distance of about two miles from the point where it originally started its northerly turn opposite Dean's Island.

Early maps showed little change in the river between 1823 and a chart made in 1874 by the War Department, except that the river had cut into the Tennessee bank south and southwest of Dean's Island, increasing its width from about one mile to 1–¼ or 1½ miles.

The stipulation continued:

"On March 7, 1876, the river suddenly and with great violence, within about thirty hours, made for itself a new channel directly across the neck opposite the apex of Dean's Island, so that the old channel around the bend of the elbow (a distance of fifteen to twenty miles) was abandoned by the current, and although it remained for a few years covered with dead water it was no longer navigable except in times of high water for small boats, and this continued only for a short time, since the old bed immediately began to fill with sand, sediment, and alluvial deposits. In the course of time it became dry land suitable for cultivation and to a considerable extent covered with timber. The new channel is called, from the year in which it originated, the "Centennial Cut-Off," and the land that it separated from the Tennessee mainland goes by the name of Centennial Island." 246 U.S. at 161–162, 38 S.Ct. at 302.

Similar descriptions of the formation of the island as a result of the avulsion are contained in extensive opinions of this Court in the cases of *State v. Muncie Pulp Co.,* 119 Tenn. 47, 104 S.W. 437 (1907), and *Stockley v. Cissna,* 119 Tenn. 135, 104 S.W. 792 (1907), *rev'd,* 246 U.S. 289, 38 S.Ct. 306, 62 L.Ed. 720 (1918).

Holding contrary to decisions of the highest courts of both states, the Supreme Court of the United States concluded that apart from the avulsion, the true boundary line between the two states

". . . is the middle of the main channel of navigation as it existed at the Treaty of Peace concluded between the United States and Great Britain in 1783, subject to such changes as have occurred since that time through natural and gradual processes.

"(2) By the avulsion of 1876 the boundary line between the States was unaffected, and remained in the middle of the former main channel of navigation, as above defined.

"(3) The boundary line should now be located according to the middle of that channel as it was at the time the current ceased to flow therein as a result of the avulsion of 1876." 246 U.S. at 177, 38 S.Ct. at 306.

The Supreme Court of the United States appointed a commission of three persons to fix the state boundaries, and the matter was litigated between the two states for a period of several years. In the case of *Arkansas v. Tennessee,* 269 U.S. 152, 46 S.Ct. 31, 70 L.Ed. 206 (1925), assertions of the State of Tennessee were discussed and rejected. The Court remarked:

"The thing to be done must be regarded. It is to locate the boundary along that portion of the bed of the river that was left dry as a result of the avulsion, according to the middle of the main navigable channel at the time the current ceased to flow therein as a result of the avulsion. Absolute accuracy is not attainable." 269 U.S. at 157, 46 S.Ct. at 32.

Ultimately the report of the commission was accepted and the boundary fixed, again over the protest of the State of Tennessee. 271 U.S. 629, 46 S.Ct. 634, 70 L.Ed. 1122 (1926). In the latter decree a total boundary length of 22.09 miles was fixed by surveyors' calls and distances, and the Supreme Court of the United States held:

"The foregoing is here and now made the boundary line between the two states parties hereto and the same shall be treated and fixed as the boundary line in question and the same shall be marked accordingly." 271 U.S. at 629, 46 S.Ct. at 635.

This becomes important because of testimony in the present litigation by witnesses for the appellees that the Supreme Court of the United States and its commissioners erred in fixing the boundary and in locating the 1876 navigational channel. In particular the witness for appellees, Judge Robert L. Taylor, insisted that the state line was inaccurately located and should have been fixed considerably to the south and west of the point established by the commissioners of the United States Supreme Court. One of the surveyors who testified in the case also agreed and felt that the 1876 channel and state line had not been correctly located.

Because of subsequent litigation between the State of Tennessee and the predecessors in title of the appellees, these questions are foreclosed. No party to the present litigation is free to go behind or to seek to avert the force and effect of the decision of the Supreme Court of the United States, the true location of the state boundary, or decrees of the Chancery Court of Tipton County, Tennessee, fixing the 1876 low water mark with reference to the state boundary line established by the Supreme Court of the United States.

■ The litigation between the two states, of course, would not necessarily be binding or conclusive upon private litigants and their land titles. The Supreme Court held that state law governed the devolution of title to the area formerly consisting of the river bed. In 1929 the State of Tennessee instituted litigation against numerous defendants, including predecessors in title of all of the parties to the present case, seeking to establish the state's title to its part of the former bed of the Mississippi River. Under Tennessee law title to the bed of a navigable stream, to the low-water mark, is publicly held and belongs to the State. *See State v. Muncie Pulp Co., supra.*

The bill of complaint and two decrees growing out of the 1929 litigation were filed in evidence in the present case by stipulation. Since appellees have attacked these proceedings and have sought to escape their force and effect, we are of the opinion that they warrant fairly detailed consideration.

The complaint filed in the Chancery Court of Tipton County, Tennessee, on May 14, 1929, by the State Attorney General described the litigation between Tennessee and Arkansas. It joined numerous parties defendant including, by amendment, C.A. Stockley, predecessor in title of the appellants. Also joined were thirteen persons named Williams, predecessors in title of the appellees. The complaint recited that the boundary between Tennessee and Arkansas had been settled by the United States Supreme Court in its opinion at 271 U.S. 629, 46 S.Ct. at 634, *supra,* and a portion of that boundary line was quoted in the complaint. The complaint alleged that the state line

fixed by the Supreme Court had been surveyed and marked on the ground by commissioners appointed by that Court. The complaint then alleged that the defendants claimed part of the lands in the abandoned bed of the Mississippi River "between the State line aforesaid and the left bank of said river as it flowed at this point immediately prior to the avulsion of 1876, known as the Centennial Cut-off, and as shown on the map hereto attached and made a part hereof, described as follows . . . ."

Immediately following the legal description are these allegations:

"Plaintiff avers that said land is that part of the bed of the Mississippi River at this point, lying in the State of Tennessee as said river flowed immediately prior to the avulsion of 1876 known as the Centennial Cut-off.

"That the boundary of said land is designated by the red line upon the map attached hereto and made a part of this complaint."

Exhibited to that complaint and made Exhibit 1 in the present case was the plat referred to, showing the state line and the property claimed by the State and by the joined defendants. The map purported to outline the bed of the Mississippi River, showing the "1876 Bank of Mississippi River" marked in red from a point on McKenzie Chute to a point south of the mouth of Jerre Chute.[2] This red line represented the eastern and northern boundaries of the river bed as claimed by the State of Tennessee. It clearly shows the state boundary as fixed by the commissioners of the Supreme Court of the United States. Indeed that boundary represented the southern and western line of the tract claimed by the state in the chancery proceedings. Lying entirely within the perimeters of the river bed as shown on the plat was a low marshy area described as "Willow Flat," later referred to in the record and in subsequent maps as "Willow Lake." The boundary line of the tract claimed by the State in these proceedings and subsequently sold by it to

the predecessors of appellants lay to the east and north of Willow Lake in the lower, or southern, part of the tract. This becomes important, because appellees now claim to the middle of Willow Lake, and it is there that they erected a fence about 1974 or 1975.

Various defending parties filed answers in the 1929 litigation, denying the allegations of the complaint and alleging that they owned title to the land claimed by the State by accretion or by earlier land grants.

On February 10, 1930, two decrees were entered in the Chancery Court of Tipton County, both pertinent to the present litigation. The first of these contained a recital that the court had considered the original bill as amended, exhibits and certain depositions, including that of O.W. Gauss. The court found that all of the predecessors in title of appellees were before the court but that they had failed to make a defense and that judgments pro confesso had been taken against them. The decree divested out of all of these defending parties any right or title to the land described in the original complaint and vested it in the State of Tennessee, the legal description appearing in the decree being identical with that in the bill of complaint, insofar as pertinent here. A second decree entered the same day dealt with the rights of those defendants who had answered the complaint, including C.A. Stockley and Warner Smith, predecessors in title of appellants. This decree also recited that the Court had considered the original bill as amended, the exhibits and depositions, including that of O.W. Gauss. It recited that certain of the defendants had disclaimed any interest in the lands. It further recited that by consent the State of Tennessee had agreed to transfer all of its right, title and interest in and to the lands to C.A. Stockley, upon his paying the sum of $4,000.00. This decree is the basis of the claim of appellants to the entire tract by subsequent conveyances from Stockley. It vested in Stockley title to the same land described in the original

2. Jerre Chute was still in existence and identifiable on maps and aerial photographs made during the 1950s and 1960s, exhibited to the trial record.

bill of complaint, following along the Tennessee-Arkansas state line, as fixed by the U.S. Supreme Court, on the southerly and westerly side and continuing as follows: ". . . thence running east along the south line of said Slade grant approximately 1200 feet to an intersection with the left bank of the Mississippi River as it flowed immediately prior to the avulsion of 1876 known as the Centennial Cut-off . . . ."

The description continued with the left bank of said river "as it flowed at the time of the Centennial Cut-off" in a southerly, southeasterly and easterly direction to its intersection "with the present right bank of the Mississippi River." It then followed that bank of the river 4300 feet south to the beginning point in the state line.

From an examination of this decree there can be no question but that the court, correctly or incorrectly, fixed the east or left bank of the Mississippi River as it flowed in 1876 as between all of the parties to that litigation and their successors in title, including all parties to the present litigation. It fixed that boundary about 1200 feet east of a point in the state line and followed it south and east according to the plat which was exhibited to the original bill.

Much was made in the present record of the fact that the plat itself was not physically incorporated into the final decrees, or incorporated by reference. However, all of the surveyors who testified in this case stated that the map appeared to depict the property purported to be conveyed in these two decrees, and we think that the evidence is conclusive on that point.

■ The trial judge charged the jury that the "decretal" or "mandatory" part of the decrees did not necessarily incorporate the map, or plat, but that the plat could be the basis for expert opinion. It was the basis of such expert opinion, and we believe that the appellees are now bound by the 1930 proceedings and that their attempts to go behind those proceedings and to establish that the 1876 low-water mark of the river lay to the west and south of that fixed by the 1930 decrees are legally untenable and impermissible. Accordingly we hold

without hesitation that the plat exhibited to the 1929 bill of complaint correctly showed the land claimed by the State of Tennessee. Title thereto was confirmed in the State in the proceedings and then conveyed by it to Stockley and his successors. If there were errors in the 1930 proceedings, they should have been raised at that time by parties then before the court. No errors were asserted, the decree became final, and it became the basis of the title claimed by the appellants.

Tipton County tax maps were subsequently prepared, showing generally the same boundary as that on the plat exhibited to the 1929 chancery complaint. The tax maps, introduced by the tax assessor, also showed Willow Lake as lying well within the boundaries of the property claimed by appellants.

It is stipulated that appellants have paid taxes on all of the disputed area since 1933. Insofar as the record shows, appellees have neither sought to have taxes assessed to them nor have they paid taxes on any of this area. This, alone, creates a presumption of ownership of the entire area in the appellants under T.C.A. § 28–2–109, as follows:

"Any person holding any real estate or land of any kind, or any legal or equitable interest therein, who has paid, or who and those through whom he claims have paid, the state and county taxes on the same for more than twenty (20) years continuously prior to the date when any question arises in any of the courts of this state concerning the same, and who has had or who and those through whom he claims have had, his deed, conveyance, grant or other assurance of title recorded in the register's office of the county in which the land lies, for said period of more than twenty (20) years, shall be presumed prima facie to be the legal owner of said land."

While this presumption is rebuttable, it was certainly raised on the present record, but it was not alluded to by either of the courts below.

We are firmly of the opinion that any attempt by the appellees now to go behind or to disregard the 1930 decrees of the Chancery Court of Tipton County must fail, including their attempt now to argue that the Attorney General of the State of Tennessee had no authority to enter into those proceedings or to execute the decree conveying the property to the predecessors of appellants.

The surveyor for the State of Tennessee in the 1930 proceedings was O.W. Gauss, an engineer. As a result of the 1930 decrees, Mr. Stockley and his successors in interest had acquired what they understood to be the 1876 bed of the Mississippi River to the low water mark on the Tennessee side. They employed Mr. Gauss to survey and mark this line on trees in the area, which was all low, swampy and subject to flooding. This was done, and the line referred to in the record as the Gauss Yellow Line was established in the early 1930s and maintained until the property was cleared of timber in the late 1960s. It represents the northerly boundary of the entire 430 acres now in dispute and represents the most northerly and easterly lines of the property claimed by appellants.

Appellees derived their property through a family named Williams who held by earlier land grants. These persons were defendants to the 1930 litigation but made no defense and suffered whatever right, title or interest they might have in the river bed, as established in the 1930 suit, to be divested out of them and ultimately into Stockley. Later, through mesne conveyances, they sold their property to Keltner and Glass, the present owners. Surveying independently of the 1930 decree, two surveyors for the appellees, Mr. Carter and Mr. Green, attempted to locate the southerly and westerly boundaries of the property of appellees and to plat them. They did this in the 1950s and those plats are in the record. Their plats overlap the Gauss Yellow Line slightly and at several points, creating an overlap of about 130 acres. Their plats, however, also clearly placed Willow Lake entirely within the property lines of appellants, as had the tax map and all of the

earlier plats. Deeds to the property now claimed by appellees were recorded in 1961, and these were surveyed and platted by Mr. Green. On the basis of his plat a partition suit, in which the present appellees or their predecessors participated, was settled in separate chancery court proceedings.

Appellants learned in the 1960s that the 1961 Keltner deeds overlapped their line. A dispute between the adjoining property owners developed. In 1968 they entered into a formal agreement to settle the dispute. They temporarily settled other controversies such as access to power lines and roadways. For various reasons the agreement made in 1968 was never carried out. The overwhelming preponderance of the evidence in this case, however, is that at no time prior to the middle 1970s did appellants have any idea that appellees were making any claim, of record or otherwise, to any portion of Willow Lake in the lower portion of the crescent involved here.

## B. *Proceedings Below*

At some time between 1973 and 1975 appellees undertook to fence an additional three hundred acres to the south and west of the area which had previously been in dispute. They ran a fence south to the middle of Willow Lake and thence westerly and northerly for a distance of two to three miles.

All of this area had been low, swampy and subject to flood. Ultimately, however, it developed valuable timber. In about 1974 Willow Lake was drained and the area comprising it has now become very valuable farm land. In addition all of the other area in dispute has been cleared of timber and likewise constitutes fertile tillable soil with the exception of some drains or low places. Flooding has been partially controlled by dams and pumps. What apparently was the main channel of the Mississippi River after the avulsion of 1876, to the east of the property now in dispute, is now known as Brandywine Chute. The main channel of the river lies farther east. The channel of the river has shifted many times over the years, and there are numerous old river

beds or channels throughout this portion of west Tennessee and Arkansas.

The Arkansas-Tennessee state line has remained as fixed by the United States Supreme Court. All of the surveyors who testified in the case located that line as well as the land described in the 1930 decrees and the Gauss Yellow Line painted as a result thereof. By their independent surveys, Mr. Carter and Mr. Green, not using the 1930 decrees but using old land grants to the Williams family, fixed the southern and western boundary of the Williams— now appellees'—property as aforesaid, overlapping the Gauss Yellow Line but by no means including Willow Lake or the three hundred acres which appellees fenced in 1973 or 1975.

When appellees did erect this fence and thereafter, in 1976, executed partition deeds among themselves calling for the fence as their boundary, appellants filed this action. The case was tried for two weeks. Voluminous testimony and a multitude of exhibits, plats and maps were filed in evidence.

Appellees demanded a jury, and at the conclusion of the trial three questions were put to the jury by the Chancellor. He explained to the jurors that he would decide all other questions except those three. The parties made no objection to this procedure. Therefore, in accordance with Rule 49.01 T.R.C.P., they waived a jury trial as to all issues except the three which were propounded to the jury.

Those three questions pertained to adverse possession for seven years or possession under color of title recorded for thirty years.[3] The primary claim of appellees to the 300 acres which they fenced in the 1970s was adverse possession. They insisted that they had fenced it much earlier and had used it to the exclusion of all others for more than seven years. However, their principal witness, Judge Robert Taylor, testified that the fence was not erected until he advised appellees to do so after he left the bench. He said, "I think it would prob-

ably have been along in 1972 or 1973." This was the last testimony heard by the jury. It contradicted the testimony of the other witnesses for appellees and confirmed the testimony of Mr. W.B. Uhlhorn and other witnesses for appellants.

Insofar as appellees are concerned, the question put to the jury was as follows: "Were the defendants, Keltner, Glass, et al., in adverse possession of the area between the center of Willow Lake and the Gause [*sic*][4] Yellow Line for a period of seven (7) years immediately preceding February 1, 1977, the date the suit was filed by the plaintiffs?"

The jurors answered this question in the negative. They also answered negatively similar questions propounded to them concerning the possession of the appellants. Upon the receipt of these answers, the Chancellor dismissed the suit. He made no findings of fact or conclusions of law. Since one claim of appellants was in ejectment, the Chancellor seemed to hold that they had not deraigned a perfect title. He did not state this expressly but the final decree recited that he had decided all issues, other than those put to the jury, in favor of the defending parties.

The Court of Appeals affirmed, finding that "the evidence does not preponderate" against the findings of the Chancellor. It outlined the history of the case, substantially as heretofore set forth, but made no reference to the payment of taxes by appellants or the presumption arising therefrom. It apparently found that the 1930 decrees of the chancery court described land other than that shown on the map exhibited to the 1929 complaint and concluded that appellants had not sufficiently located their property lines.

Apparently the Court of Appeals was of the opinion that the low water mark of the Mississippi River as it flowed in 1876 was south and west of the Gauss Yellow Line. We find that this conclusion is not supported in the record, but even if it were, it

---

**3.** T.C.A. §§ 28-2-101, 105.

**4.** The name of the surveyor is spelled variously in the record as "Gauss" or "Gause."

would make no difference in this case. The Gauss Yellow Line represented the north and eastern boundaries of property successfully claimed by the State and then deeded to appellants. It was held to be the low water mark of the river in the 1930 suit. Appellants cannot be forced by these appellees, whose predecessors were parties in 1930, to re-litigate that issue a half century later.

As the case comes to this Court there is no concurrent finding of fact since the Chancellor made no findings or conclusions. As stated by the Court in *City of Columbia v. C.F.W. Construction Co.,* 557 S.W.2d 734, 740 (Tenn. 1977):

"And in cases such as the instant one, in which the trial judge has failed to make specific findings, although a particular finding might be considered to be implicit in his holding, this Court is not bound by the concurrent finding of fact rule on the theory that the trial judge and Court of Appeals have made concurrent findings; in such situations this Court will review the record with a view to determine where the preponderance of the evidence lies with respect to the issue of fact in question. *Kemp v. Thurmond,* Tenn. 521 S.W.2d 806 (1975). It is by this standard that we have reviewed the evidence in this case."

## C. *Our Conclusions*

After a careful examination of this very involved and complex record, we are firmly of the opinion that the appellants have shown clear title deraigned from the State of Tennessee to the 300 acres which appellees attempted to fence and to seize within less than seven years before this suit was brought.

While appellees offered some testimony that they had used this portion of the property adversely and exclusively for more than seven years, there was strong and convincing evidence to the contrary. The jury apparently disbelieved the appellees in this regard, particularly when Judge Taylor testified that he had not advised the erection of a fence until after 1972 or 1973.

Neither appellees nor appellants question that the jury verdict, as far as it went, was fully supported by material evidence. The parties have not sought to overturn that verdict but have acquiesced in it.

The questions propounded to the jury, however, were broadly phrased. The jurors were asked whether or not appellees were "*in adverse possession of the area between the center of Willow Lake and the Gauss Yellow Line for a period of seven (7) years . . . .*"

When the jurors answered this question "No", apparently they were of the opinion that appellees had not been in adverse possession of the entire 430 acres. The record sustains this finding. When they answered a similar question pertaining to the possession of appellants, they likewise apparently concluded that appellants were not in possession of the entire area. All other questions were reserved for determination by the court, rather than the jury.

The issues put to the jury do not preclude a finding that either or both of the parties may have had exclusive possession of some part or segment of the disputed acreage. We find this to be the situation. As to the area south of the line called for by the 1961 deeds of appellees, we find that the Uhlhorns, appellants here, had clear title deraigning from the 1930 chancery court decrees and also had substantial if not exclusive possession thereof prior to the erection of appellees' fence. They also had record title to the other 130 acres which had been in dispute since the 1960s, up to the Gauss Yellow Line.

As to that acreage, however, appellees had been in possession under deeds of record, to the knowledge of appellants since 1961. Four surveyors, at one time or another, had surveyed the boundary lines of the Uhlhorns and the Keltner-Glass families. These surveyors, Mr. Gauss, Mr. Carter, Mr. Green and Mr. Richardson, all fixed the line very close together, overlapping by only one hundred thirty acres out of tracts comprising thousands of acres. The boundary line between the contending parties, therefore, is clearly shown to have lain in this 130-acre

area, not along a fence in the middle of Willow Lake as claimed by appellees.

Apart from adverse possession, the claim of appellees to the Willow Lake fence is slender indeed. No expert witness has ever placed the boundary there. Judge Taylor testified, however, that he was of the opinion that the state line had originally been improperly located by the Supreme Court of the United States. He also was of the opinion that the Gauss Yellow Line was placed far to the north and east of the true low-water mark of 1876 and that appellees or their predecessors must have had accretions to their property between the Gauss Yellow Line and the actual low-water mark of the Mississippi in 1876. He admitted that the deeds of appellees did not reflect this. When asked about his advice to the appellees to build a fence in Willow Lake, he testified:

"A.  I never did advise them anything except that Mr. Green and I felt like the low water mark as shown on Chart 19 was correct; but that we felt like we could not prevail in the lawsuit below Willow Lake. And I instructed them to run that fence down the center of Willow Lake since that was the thread of the stream. I advised him that in my opinion they owned down to the bank of Willow Lake.

Q.  All right now, by what authority or for what reason did you advise them to put the fence in the middle of Willow Lake?

A.  Because it was a non-navigable stream, and the owner abutting a non-navigable stream owns to the thread of the stream."

The chart referred to by Judge Taylor and which had been referred to also by Mr. Carter was an 1879 map of the Mississippi River in this area, prepared by the Mississippi River Commission. Based upon that map, Mr. Carter was of the opinion that the low-water mark of the river as it flowed prior to 1876 was south and west of the bank established in the 1930 chancery proceedings. We have already stated that the

parties in the present case cannot be permitted to go behind those proceedings. In addition, the 1879 map was made three years after the avulsion and reflects an area that was in obvious change and transition. Deductions as to where the low-water mark lay in 1876, based upon the 1879 map, are, at most, speculative and of little probative value. That entire question was litigated at great length in the United States Supreme Court by the two states involved and was again presented for determination by the Chancery Court of Tipton County in 1930. As between these parties, that issue was settled once and for all by those two tribunals, and it is foreclosed to the parties in the present case, all of whom are bound by those decrees.

Accordingly, in our opinion, appellants, the Uhlhorns, are entitled to all of the property in dispute south and west of the calls of the 1961 Keltner deeds. However, appellees have claimed the 130 disputed acres embraced within those deeds since 1961 to the knowledge of appellants, who took no legal action until 1977. Further, the preponderance of the evidence shows that appellees have had exclusive and adverse possession of that portion of the disputed tract. We therefore affirm so much of the decision of the courts below as awarded that 130 acres to the appellees. Otherwise the decrees of the courts below will be reversed and the cause will be remanded to the Chancellor with directions to enter a decree in accordance with this opinion and to decree possession to appellants of all of the property except as above stated. He will fix the boundary line between these adjoining landowners according to the express calls of the 1961 deeds, even if these vary somewhat from the Green survey. All general references in those deeds to "accretions" or to undescribed parts of beds of rivers and streams will be disregarded. That boundary will be fixed as the permanent boundary between the properties of these parties. Any contrary parts of the partition deeds executed by appellees in 1976 will be cancelled. The Chancellor will also make proper allowances to appellants

for accrued rentals and any other proper adjustments of the rights of the parties consistent herewith.

Costs incident to these proceedings will be divided equally between the parties, including costs on appeal.

FONES, COOPER, BROCK and DROWOTA, JJ., concur.